Morris **BILLER** and Vincent R. Sombrotto, Petitioners,

v.

**UNITED STATES MERIT SYSTEMS PROTECTION BOARD, Respondent.**

**No. 351, Docket 87–4076.**

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1987.

Decided Dec. 16, 1988.

Keith E. Secular, New York City (Sophia Davis, Cohen, Weiss & Simon, New York City, Darryl J. Anderson, Anton Hajjar, O'Donnell, Schwartz & Anderson, Washington, D.C., of counsel), for petitioners.

Deborah Stover–Springer, Washington, D.C. (Llewellyn M. Fischer, Gen. Counsel, Mary L. Jennings, Deputy Gen. Counsel, Marsha E. Mouyal, Reviewer for Litigation, Merit Systems Protection Bd., Washington, D.C., of counsel), for respondent.

Before NEWMAN and CARDAMONE, Circuit Judges and GRAY, District Judge.*

CARDAMONE, Circuit Judge:

On this appeal we are called upon to construe the Hatch Act and its implementing regulations. Passage of that Act signalled Congress' determination that for the government to function fairly and efficiently, it must limit the political activities of federal employees, employees of the District of Columbia, and certain employees of state and local governments. This petition for review is from a final decision and order of the Merit Systems Protection Board (Board), which found that petitioners Morris Biller and Vincent R. Sombrotto violated the Hatch Political Activities Act, 5 U.S.C. §§ 7321–7327 (1982 & Supp. IV 1986) (Hatch Act). The Board ordered that petitioners each be suspended from Postal Service employment for 60 days. As residents of this Circuit, petitioners seek to have the Board's order set aside pursuant to 5 U.S.C. § 1207(c).

## I  BACKGROUND

### A.  *Facts*

Morris Biller and Vincent R. Sombrotto are the presidents of, respectively, the American Postal Workers Union, AFL–CIO (Postal Workers Union) and the National Association of Letter Carriers, AFL–CIO (Letter Carriers Union). Both unions are national labor organizations that represent

---

* Honorable William P. Gray, United States District Court for the Central District of California, sitting by designation.

bargaining unit employees of the United States Postal Service. Petitioners have been on leave without pay from Postal Service employment for an extended period of time. Morris Biller has been employed by the United States Post Office Department since May 8, 1937. On April 1, 1959 he took extended leave to serve as a postal union officer, and since November 1980 has served as president of the Postal Workers Union. Vincent R. Sombrotto has been employed by the United States Post Office Department since December 1, 1947. On January 15, 1971 he took extended leave to serve as a union officer. He has been president of the Letter Carriers' Union since January 1979.

Both unions circulate official monthly magazines. The Postal Workers Union publishes "The American Postal Worker," and the Letter Carriers Union publishes "The Postal Record." As presidents of their Unions, petitioners contribute regular columns to these magazines. The unions also publish newsletters and other periodicals which frequently report statements by petitioners. In their regular magazine columns and in other statements made in 1983 and 1984 and quoted in the union periodicals, the subject of petitioners' discussion was the upcoming presidential election. Their statements generally expressed support for Democratic presidential candidate Walter Mondale and opposition to incumbent President Ronald Reagan and sometimes criticized the Reagan administration on issues of interest to postal workers. Petitioners' articles encouraged union members to vote for Mondale and to contribute to the unions' political action funds, which are funds segregated from the unions' own finances.

The theme of most of Morris Biller's articles in the "American Postal Worker Magazine" was to urge the postal union to help the defeat of President Reagan: "[w]e must raise a half-million dollars as our contribution to changing the tenant in the White House"; "[w]e have got to get a President in the White House who will be sensitive to the needs of organized labor"; "[i]n addition to seeking a new tenant in the White House, it is imperative that we play a role to help elect Congressmen and Senators who are sensitive to our needs...." A typical example of Vincent R. Sombrotto's writing in "The Postal Record" follows: "[t]o recapture America *and* save our jobs and benefits, letter carriers must join with other working men and women to support the Democratic nomination, the candidate of the American labor movement—Walter Mondale." (emphasis in original).

## B. *Proceedings Below*

The complaints alleged—and the Board found—that these statements made by petitioners violated the Hatch Act. The Board reasoned that because petitioners' articles contained language which explicitly "exhort[ed] others to vote in a particular way", the articles represented "more than mere opinion." Instead, the Board thought these and the other statements were "a continuing and pointed effort" to enlist support for candidate Mondale from among the union membership. Petitioners readily acknowledge that in their writings they sought, as union officers, to persuade their members to vote for Mondale. But they vigorously deny that either this intent or the explicitness of their message is sufficient to justify characterizing their articles as violative of the Hatch Act.

The Hatch Act states that federal employees may not "take an active part in political management or in political campaigns." 5 U.S.C. § 7324(a)(2). At the same time, the Act specifically protects an employee's right "to express his [or her] opinion on political subjects and candidates." *Id.* § 7324(b). Pursuant to the Civil Service Reform Act of 1978, violations of the Hatch Act are investigated and prosecuted by the Merit System Protection Board's Office of Special Counsel and charges of such violations are adjudicated by the Board. *See* 5 U.S.C. § 1206(a)(1), (g)(1); 5 U.S.C. § 1207(a)(3); 5 C.F.R. §§ 1201.121–1201.129. On February 26, 1985 the Special Counsel filed separate complaints against petitioners alleging that they had taken "an active part" in a political campaign, in violation of the Hatch Act,

5 U.S.C. § 7324(a)(2), and related regulations, 5 C.F.R. §§ 733.122(b)(3) (soliciting funds); (7) (soliciting votes) and (10) (endorsing or opposing a candidate). The complaints requested the Board to impose such disciplinary action against petitioners as it deemed appropriate.

The charges against petitioners were based *solely* on articles and statements in their union publications in 1983 and early 1984, which either (1) expressed opposition to President Reagan's reelection or support for the candidacy of Walter Mondale, or (2) urged union members to contribute to the unions' political action funds. Significantly, the Board concedes that in making these statements, petitioners did not act in concert—and had no connection—with any political party or campaign organization.

Petitioners' answers to the complaints denied that they violated the Hatch Act and asserted various affirmative defenses. Petitioners argue that if they are found to have violated the Hatch Act, then such an application of the Act abridges their First Amendment rights. On May 8, 1985 at a preliminary hearing before an Administrative Law Judge (ALJ) the parties waived an evidentiary hearing and submitted the case upon a joint stipulation of facts and exhibits. The ALJ concluded that petitioners were federal employees covered by the Hatch Act and that their published statements constituted unlawful campaign activity under § 7324(a)(2), and rejected petitioners' arguments that they were protected by § 7324(b) and by the First Amendment. The ALJ recommended 60 days suspension from employment. The Board issued a final order on February 5, 1987 adopting the ALJ's decision. This appeal followed.

## II DISCUSSION

Although considerable argument is raised relative to petitioners' employment status, we assume for purposes of this appeal that they were not union employees, but were postal employees on extended leave. *See Blaylock v. U.S. Merit Systems Protection Bd.*, 851 F.2d 1348, 1350 & n. 4 (11th Cir.1988) (consolidated with petitioners' case before Board). Since, on that assumption, petitioners are subject to the Hatch Act, the question then becomes whether they have violated the Act.

Petitioners contend that the Hatch Act and its regulations distinguish, on the one hand, between a protected expression of opinion and on the other, from engaging in prohibited activity in connection with a particular campaign. The Board responds that a federal employee can violate the Act without engaging in formal concerted activity as part of a partisan campaign. It argues that articles in union publications that endorse partisan candidates, and that solicit votes and money violate the Hatch Act. To support these conflicting contentions, both sides to this appeal cite the same authorities: (1) the legislative history of the Hatch Act; (2) long-standing interpretation of the Act and its regulation by the Civil Service Commission and Board; and (3) Supreme Court precedent in *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (*Letter Carriers*).

We begin with the pertinent provisions of the Hatch Act and its implementing regulations, which provide:

(a) An employee in an Executive agency or an individual employed by the government of the District of Columbia may not—

. . . .

(2) take an active part in political management or in political campaigns. For the purpose of this subsection, the phrase "an active part in political management or in political management or in political campaigns" means those acts of political management which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President.

(b) An employee or individual to whom subsection (a) of the section applies retains the right to vote as he chooses and

to express his opinion on political subjects and candidates.

5 U.S.C. §§ 7324(a)(2), 7324(b). The reference in subsection (a)(2) to "determinations of the Civil Service Commission" effectively incorporates into the Hatch Act approximately 3,000 pre–1940 rulings of that Commission. The regulations, codified at 5 C.F.R. Part 733, divide an employee's activities into those that are permissible and those that are prohibited. Permissible activities are set forth in § 733.111.[1] Prohibited activities are enumerated in § 733.121 and § 733.122.[2]

1. § 733.111 Permissible Activities

(a) All employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law and this subpart. Each employee retains the right to—

(1) Register and vote in any election;

(2) Express his opinion as an individual privately and publicly on political subjects and candidates;

(3) Display a political picture, sticker, badge, or button;

(4) Participate in the nonpartisan activities of a civic, community, social, labor, or professional organization, or of a similar organization;

(5) Be a member of a political party or other political organization and participate in its activities to the extent consistent with law;

(6) Attend a political convention, rally, fund-raising function; or other political gathering;

(7) Sign a political petition as an individual;

(8) Make a financial contribution to a political party or organization;

(9) Take an active part, as an independent candidate, or in support of an independent candidate, in a partisan election covered by § 733.124;

(10) Take an active part, as a candidate or in support of a candidate, in a nonpartisan election;

(11) Be politically active in connection with a question which is not specifically identified with a political party, such as a constitutional amendment, referendum, approval of a municipal ordinance or any other question or issue of a similar character;

(12) Serve as an election judge or clerk, or in a similar position to perform nonpartisan duties as prescribed by State or local law; and

(13) Otherwise participate fully in public affairs, except as prohibited by law, in a manner which does not materially compromise his efficiency or integrity as an employee or the neutrality, efficiency, or integrity of his agency.

(b) Paragraph (a) of this section does not authorize an employee to engage in political activity in violation of law, while on duty, or while in a uniform that identifies him as an employee. The head of an agency may prohibit or limit the participation of an employee or class of employees of his agency in an activity permitted by paragraph (a) of this section, if participation in the activity would interfere with the efficient performance of official duties, or create a conflict or apparent conflict of interests.

2. § 733.121 Use of official authority; prohibition.

An employee may not use his official authority or influence for the purpose of interfering with or affecting the result of an election.

§ 733.122 Political management and political campaigning; prohibitions.

(a) An employee may not take an active part in political management or in a political campaign, except as permitted by this subpart.

(b) Activities prohibited by paragraph (a) of this section include but are not limited to—

(1) Serving as an officer of a political party, a member of a National, State, or local committee of a political party, an officer or member of a committee of a political party, an officer or member of a committee of a partisan political club, or being a candidate for any of these positions;

(2) Organizing or reorganizing a political party organization or political club;

(3) Directly or indirectly soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose;

(4) Organizing, selling tickets to, promoting, or actively participating in a fund-raising activity of a candidate in a partisan election or of a political party, or political club;

(5) Taking an active part in managing the political campaign of a candidate for public office in a partisan election or a candidate for political party office;

(6) Becoming a candidate for, or campaigning for, an elective public office in a partisan election;

(7) Soliciting votes in support of or in opposition to a candidate for public office in a partisan election or a candidate for political party office;

(8) Acting as recorder, watcher, challenger, or similar officer at the polls on behalf of a political party or a candidate in a partisan election;

(9) Driving voters to the polls on behalf of a political party or a candidate in a partisan election;

(10) Endorsing or opposing a candidate for public office in a partisan election or a candidate for political party office in a political advertisement, a broadcast, campaign, literature, or similar material;

## A. History Leading to Enactment of the Hatch Act

To put the constitutional and policy arguments made in construing the Hatch Act's permitted and prohibited activities in proper perspective, it is necessary to review briefly the history that preceded its enactment. Political activity by government employees has caused concern since the birth of the Republic. In the first quarter of the nineteenth century, honesty and high ethical practices predominated due to President Washington's scrupulous requirement of fitness in government officials. G.C.S. Benson, *Political Corruption in America* 73 (1908) (*Benson*). In 1801 Thomas Jefferson issued a circular expressing his view that federal employees should be politically neutral, stating: "it is expected that [such employees] will not attempt to influence the votes of others, nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it." Vaughn, *Restrictions on the Political Activities of Public Employees: The Hatch Act and Beyond*, 44 Geo.Wash.L.Rev. 516, 517 (1976) (*The Hatch Act and Beyond*).

The advent of Jacksonian democracy witnessed the rise of partisan politics and political corruption, a trend that continued and increased up to and after the Civil War and culminated in the Grant administration. *Benson* at 76–82. Public outcry against the "spoils system", by which federal jobs were doled out to reward political loyalty, prompted the executive branch attempt to eliminate this pernicious system. Presidents Grant in 1873 and Hayes in 1877 issued executive orders to mandate political neutrality for federal employees. Neither order succeeded. Vaughn, *The Hatch Act*

*and Beyond*, 44 Geo.Wash.L.Rev. at 517. President Arthur viewed the defeat of Republican Congressional candidates in the election of 1882 as a public demand for civil service reform. Congress thereupon enacted in December of 1882 the Pendleton or Civil Service Act, which President Arthur signed into law in January, 1883. *See also Letter Carriers*, 413 U.S. at 558, 93 S.Ct. at 2887; *see also Benson* at 85. This Act aimed to diminish political partisanship in federal hiring and to limit political activity by federal civil service employees.

Early in this century, President Theodore Roosevelt issued an Executive Order forbidding anyone "in the competitive classified service" from taking "active part in political management or in political campaigns." Vaughn, *The Hatch Act and Beyond*, 44 Geo.Wash.L.Rev. at 518 n. 8. This Executive Order remained in effect until enactment of the Hatch Act in 1939. Meanwhile federal employment had mushroomed during the ensuing 56 years between the passage of Pendleton Act in 1883 and the Hatch Act in 1939. Many agency positions created as part of the New Deal fell outside the scope of the classified civil service, hence President Roosevelt's Executive Order. The Hatch Act, in contrast, extended the civil service political neutrality rule to *both* classified and nonclassified federal employees. *Id.* at 518. With this background in mind, we examine the Act's legislative history.

## B. Legislative History of the Hatch Act

■ The legislative history of the Hatch Act, described in some detail below, indicates that Congress was deeply concerned

---

(11) Serving as a delegate, alternate, or proxy to a political party convention;

(12) Addressing a convention, caucus, rally, or similar gathering of a political party in support of or in opposition to a partisan candidate for public office or political party office;

(13) Initiating or circulating a partisan nominating petition;

(14) Soliciting, collecting, or receiving a contribution at or in the Federal workplace from any employee for any political party, political fund, or other partisan recipient;

(15) Paying a contribution at or in the Federal workplace to any employee who is the employer or employing authority of the person making the contribution for any political party, political fund, or other partisan recipient; and

(16) Soliciting, paying, collecting, or receiving a contribution at or in the Federal workplace from any employee for any political party, political fund, or other partisan recipient.

by the Act's First Amendment implications. Time and again, members of both Houses of Congress expressed their fear that federal employees would be denied the free speech protections guaranteed to other citizens. Like all Acts of Congress the Hatch Act bears a heavy presumption of constitutionality. We therefore believe that when the strictures of the Act and the First Amendment seem to conflict, it was Congress' aim that the Act be construed in favor of free expression.

The Hatch Act was originally enacted in 1939, Pub.L. No. 76–252, 53 Stat. 1147, and amended in 1940, Pub.L. No. 76–753, 54 Stat. 767, as a response to disclosures of improper political practices among the Works Progress Administration (W.P.A.) and other relief agencies during the 1938 election campaign. *See* 84 Cong. Rec. H9604 (daily ed. July 20, 1939) (statement of Rep. Springer) ("we have heard from the lips of our people who are working on the W.P.A., and those [who] are receiving direct relief, that intimidation, threats, and coercion have been exerted upon them respecting their vote at our elections."). On January 5, 1939 President Franklin D. Roosevelt called upon Congress to eliminate such practices through "the imposition of rigid statutory regulations and penalties," *id.* at 10746, but cautioned that "no legislation should be enacted which will in any way deprive workers on the Works Progress Administration Program of *the civil rights to which they are entitled in common with other citizens.*" *Id.* (emphasis added).

In March of 1939, Senators Hatch, Sheppard and Austin introduced S.1871, "[a] bill to prevent pernicious political activities." 84 Cong.Rec. S2935 (daily ed. March 20, 1939). This bill, as proposed and enacted, imposed on all federal employees the same restrictions on political activity that had previously applied only to those employees in the classified service pursuant to Civil Service Rule I. *See* S.Rep. No. 221, 76th Cong., 1st Sess. 2 (1939). That rule provided that classified employees, while retaining the right to vote as they please and to express privately their own opinions on all political subjects, shall take no active part in political management or in political campaigns.

The Senate at first considered authorizing the Civil Service Commission to promulgate regulations defining the phrase "active part in political management or in political campaigns," but Congress was unwilling to delegate such broad rulemaking power in this sensitive area of citizens' rights. Thus, the Act did not extend limitations beyond the prohibitions that then prevailed under Civil Service Rule I. *See Letter Carriers,* 413 U.S. at 570 & n. 16, 93 S.Ct. at 2893 & n. 16. Instead, to define the Act's terms, Congress incorporated into the Hatch Act the 3000 pre-Act Commission determinations. Rose, *A Critical Look at the Hatch Act,* 75 Harv.L.Rev. 510, 514–15 (1962) (Rose).

Consistent with the pre-existing civil service rules, S.1871 proposed to permit employees "to express privately their opinions on all political subjects." 84 Cong.Rec. S4192 (daily ed. April 13, 1939). Opponents of the bill in the House of Representatives vigorously asserted that limiting employees to "private" expression of opinions would violate the First Amendment. *See, e.g.,* 84 Cong.Rec. H9602 (daily ed. July 20, 1939) (statement of Rep. Hobbs). As Congressman Nichols noted on the House floor during the debate:

> for this Congress to say that American citizens shall have the right to express their opinions in private is to abrogate the Bill of Rights, which guarantees to every American citizen the right of freedom of speech..... You cannot remove this right guaranteed by the Constitution simply because a person holds a Federal position.

*Id.* at H9622 (statement of Rep. Nichols). The House therefore amended S.1871 by eliminating the word "privately" to reduce the potential restriction on freedom of speech. *Id.* (statement of Rep. Hobbs offering amendment).

Following the bill's passage, President Roosevelt and the Attorney General sent separate statements to Congress. 84 Cong.Rec. S10746 (daily ed. Aug. 2, 1939)

(statement of Pres. Roosevelt); 85 Cong. Rec. app. 712 (1939). Both contended that under the Hatch Act, employees could *publicly* state their political preferences "orally, by radio, or in writing—without doing so as part of an organized political campaign." 85 Cong.Rec. 712 (daily ed. Nov. 3 1939) (statement of Attorney General Frank Murphy). The President's message stressed that restrictions on political activity "cannot properly preclude Government employees from the exercise of the right of free speech.... It is, I am confident, the purpose of the proponents of this legislation that the new law be thus administered so that the right of free speech will remain, even to those who serve their Government...." 84 Cong.Rec. S10745–47 (daily ed. Aug. 2, 1939) (statement of Pres. Roosevelt). The Attorney General similarly noted that

> [c]ivil-Service employees are required by the civil-service rules to confine their opinions on political subjects to private expression. From the corresponding provision of the Hatch law, on the other hand, this word "privately" was omitted. Accordingly, as stated by the President in his message to the Congress approving the Hatch bill, non-civil-service employees would not violate the act "if they should merely express their opinion or preference publicly—orally, by radio, or in writing—without doing so as part of an organized political campaign."

85 Cong.Rec. 712 (daily ed. Nov. 3, 1939) (statement of Attorney General Frank Murphy). Senator Hatch endorsed the Attorney General's interpretation as "a first class and splendid effort in the interpretation and enforcement of this law." *Id.* (statement of Sen. Hatch).

Subsequently, the 1940 Congress further strengthened the free speech rights of government employees by amending the Hatch Act, *inter alia,* to provide that federal employees may express their opinions on political subjects *"and candidates".* 86 Cong.Rec. S2985 (daily ed. March 11,

1940) (emphasis added). This amendment resulted from extensive debate on the Senate floor regarding the constitutional problems that could arise in applying the Hatch Act restrictions to public employees who participate in political activity. Senator Hatch addressed these concerns by reiterating his belief that "we expressly provided that all persons should have the right to express their opinions on all political subjects, and the word 'privately,' which appears in the civil-service rule, was deliberately stricken out" so that "no curtailment or abridgment of the right of freedom of speech" resulted from the legislation. 86 Cong.Rec. S2623 (daily ed. March 11, 1940) (statement of Sen. Hatch). When the purposes of the Hatch Act and the First Amendment are at crosspurposes, it is the just recited legislative history that we believe mandates a construction of the Act in favor of First Amendment rights.

With this recitation of Congress' aims, we turn to the administrative and judicial response.

### C. *Administrative Rulings*

The 3,000 administrative decisions construing the Hatch Act form a far from seamless web. Yet they are important to our inquiry for several reasons. Congress implicitly adopted the holdings of these cases when it defined the Hatch Act's "prohibitions in terms of prior Civil Service Commission rulings." *See Letter Carriers,* 413 U.S. at 569–70, 93 S.Ct. at 2892–93; Magness, *"Un–Hatching" Federal Employee Political Endorsements* 134 U.Pa. L.Rev. 1497, 1502 (1986) (Magness); Rose, 75 Harv.L.Rev. at 512–14. Moreover, these administrative cases were decided by the agency charged with implementing the Hatch Act—the government body that arguably knows the Act best.

Both petitioners and the Board have cited numerous administrative decisions spanning the years from 1944 to 1985 in which the Civil Service Commission or the Board construed the Hatch Act.[3] Each side

---

**3.** Initially, the Civil Service Commission was charged with enforcing the Hatch Act. The Civil Service Reform Act of 1978 abolished the

Civil Service Commission. Consequently, the Commission's investigative and prosecutorial authority was transferred to the Office of the

claims support for its position in the determinations. None of these administrative decisions are dispositive, and many that found violations of the Act are inapposite. For instance, in several cases the government employee was himself or herself an active candidate for elected political office or an officeholder within the political party. *See, e.g., Special Counsel v. Sims,* 20 M.S.P.R. 236 (1984); *Special Counsel v. Hayes,* 16 M.S.P.R. 166 (1983); *Special Counsel v. Daniel,* 15 M.S.P.R. 636 (1983); *In re Seavey,* 1 P.A.R. 721 (1954). Other rulings reveal that the government employee's political activities were undertaken in concert with partisan politicians in political management or a campaign. *See, e.g., Special Counsel v. West,* 18 M.S.P.R. 519 (1984); *In re Kanemori,* 1 P.A.R. 682 (1954); *In re Hardman,* 1 P.A.R. 335 (1948); *In re Watson,* 1 P.A.R. 370 (1948); *In re Raburn,* 1 P.A.R. 333 (1948); *In re Evans,* 1 P.A.R. 331 (1947); *In re Kerr,* 1 P.A.R. 179 (1946). In several cases, the employee in question solicited and personally collected political contributions. *See, e.g., Beasley,* 3 P.A.R. 58 (1970); *Anderson,* 2 P.A.R. 1018 (1967); *In re De Arozena,* 1 P.A.R. 138 (1944). Thus, many of the decisions petitioners and respondents cite simply do not address situations similar to petitioners' magazine columns.

■ A number of cases remain that shed some light on the issue before us. We derive from *In re McDuffie,* 1 M.S.P.R. 8 (1979) (employee did not violate the Hatch Act because candidacy for public office only covers elective office), the rule that regulations under the Act must be narrowly construed because they restrict individual rights to participate in the political process. *See id.* We also note *Special Counsel v. Biggs,* 16 M.S.P.R. 355 (1983), which held that employee Biggs did not violate the Hatch Act by writing and paying to publish a letter which attacked the environmental policies of a candidate for the State Senate. In exonerating Biggs, the Board

distinguished between communicating an independent opinion on political issues—which the Act permits, and those actions which are part of "concerted political action"—which the Act prohibits. *Id.* (citing *Wilson v. United States Civil Service Commission,* 136 F.Supp. 104 (D.D.C. 1955)).

We note two cases which point in the opposite direction of *Biggs.* Both *Special Counsel v. Clause,* 26 M.S.P.R. 556 (1985), and *Special Counsel v. Tacker,* 11 M.S.P.R. 526 (1982) dealt with facts similar to those in the instant case. In *Tacker,* a labor official authored a lengthy article in his local's newsletter in which he intended to influence union members to vote for the pro-union candidate in the 1980 presidential election. 11 M.S.P.R. at 527. Similarly, in *Clause,* the federal employee wrote a union newsletter article seeking the defeat of the 1984 incumbent presidential candidate Ronald Reagan, and encouraging readers to support Walter Mondale. 26 M.S.P.R. at 558. In both cases, a violation of the Hatch Act was found. These holdings may not be squared with the paid political letter permitted in *Biggs,* and the narrow construction of the regulations required by *McDuffie.* Because of this inconsistency, we are unable to derive from the holdings of the agency charged with enforcing the Act a rule that comfortably addresses this case.

### D. Supreme Court Precedents

Analysis of Supreme Court precedents construing the Hatch Act is helpful in providing an analytical framework. But because the Court has employed a fact-specific balancing test, the cases are not controlling. The Supreme Court first upheld the constitutionality of the Hatch Act seven years after its passage. *United Public Workers of America v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Mitchell was employed as a roller in a

---

Special Counsel of the United States Merit Systems Protection Board—the respondent in this case. The Board adjudicates the disciplinary actions which the Office of Special Counsel files. Further, administration of the Commis-

sion's interpretive regulations was transferred to the Office of Personnel Management. The interpretive regulations are found at 5 C.F.R. Part 737.

**1088**

United States Mint. Outside working hours, he served as an executive committeeman of a political party and as a ward worker at the polls on election day, when he acted as paymaster for the services of other party workers. The Court balanced "[t]he extent of the guarantees of freedom against a congressional enactment to protect a democratic society against the supposed evil of political partisanship by classified employees of government." *Id.* at 96, 67 S.Ct. at 567. Noting the wide range of activities permitted under the Hatch Act, the Court then observed what the Act prohibits: "[i]t is only partisan political activity that is interdicted. It is active participation in political management and political campaigns." *Id.* at 100, 67 S.Ct. at 569. The Court expressly reserved questions concerning the validity of defining "political activity" by incorporating the Civil Service Commission determinations of prohibited activity into the Hatch Act. *Id.* at 103–04, 67 S.Ct. at 571.

*Mitchell* contemplated public employment not as a right, but as a privilege conditioned upon the surrender of constitutional rights. *See id.* at 99–100, 67 S.Ct. at 569–70. The court cited then Supreme Judicial Court of Massachusetts Judge Holmes' comment in a ruling that barred a police officer from political activity: "[he] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *Id.* at 99 n. 34, 67 S.Ct. at 569 n. 34 (quoting *McAuliffe v. New Bedford*, 155 Mass. 216, 220, 29 N.E. 517, 523 (1891)).

Twenty-six years after *Mitchell*, the constitutionality of the Hatch Act was again challenged in *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). The Supreme Court reaffirmed Congress' authority to limit political activities of federal employees. The single question before the Court was whether the provision of the Hatch Act against federal employees taking "an active part in political management or in political campaigns" is unconstitutional for vagueness and overbreadth. The asserted vagueness of the definition of "po-

litical activities" was said to derive from the incorporation of the pre–1940 agency rulings—the issue expressly reserved in *Mitchell*. *See Letter Carriers*, 413 U.S. at 533, 93 S.Ct. at 2884. The Court stated that the Commission, by performing its adjudicative function since 1907, had "fleshed out the meaning of Rule I and so developed a body of law with respect to what partisan conduct by federal employees was forbidden by the rule." 413 U.S. at 572, 93 S.Ct. at 2894. In upholding the Act, the Supreme Court explained that the impartial execution of the laws—a major purpose of the Hatch Act—required that federal employees "not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets." *Id.* at 565, 93 S.Ct. at 2890.

Significantly, *Letter Carriers* relied on *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in balancing the employee's interest, as a citizen, to comment on public matters and "the interest of the [government], as an employer, in promoting" the efficient rendering of public services. *See Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2890. *Pickering* rejected Justice Holmes' view, earlier expressed in *Mitchell*, that public employment is a privilege. 391 U.S. at 568, 88 S.Ct. at 1734; *see also Connick v. Myers*, 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688–89, 75 L.Ed.2d 708 (1983) (noting the Court's now longstanding rejection of the Holmes view). Any suggestion that a public employee "may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest ... proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734 (citations omitted).

■ We discern from these Supreme Court precedents a framework for analyzing alleged Hatch Act violations that balances the government's interests in efficiency and integrity against the employee's rights of free speech and association.

## E. *Policy Arguments*

Several strong policy reasons argue for restricting the political activities of public employees: (1) the efficient and unbiased administration of the government requires that federal employees be hired and promoted because of merit rather than ideology; (2) public employees should be protected from political coercion when performing their duties; and (3) the public interest is not served by a bureaucracy run as a federal political machine. *See* Esman, *The Hatch Act—A Reappraisal*, 60 Yale L.J. 986, 994–95 (1951). The importance of the evils to which the Hatch Act is addressed is manifested by the enactment of "little Hatch Acts" in all 50 states. *See Broadrick v. Oklahoma*, 413 U.S. 601, 604–05 n. 2, 93 S.Ct. 2908, 2912 n. 2, 37 L.Ed.2d 830 (collecting statutes).

The countervailing argument for circumscribing restrictions on federal employees was perhaps best expressed by Justice Black, who observed that public employees are guaranteed the same rights as other citizens under the Constitution. The restrictions of the Hatch Act "relegates millions of federal, state, and municipal employees to the role of mere spectators of events upon which hinge the safety and welfare of all the people, including public employees." *Mitchell*, 330 U.S. at 115, 67 S.Ct. at 577 (Black, J., dissenting).

## F. *Resolution of the Present Case*

Finally, we undertake to summarize and resolve the present appeal by drawing upon the preceeding discussion. The long history of executive attempts to circumscribe partisan political activities of federal employees has not resolved the tension between the right of all citizens—including government employees—to participate fully in our political process and the public interest that is served by ensuring that the civil service is free of the influence of partisan politics.

The legislative history, inconsistent administrative rulings and the Supreme Court decisions all reflect this stress. History reveals that the Hatch Act was a public reaction to the corrupt and inept "spoils system." Yet Congress feared a collision between the Act and the First Amendment, *see* 84 Cong. Rec. H9622, H9630, H9633, and therefore decided not to limit political expression, deleting the word "privately" in the Act's 1940 Amendment, and enlarging the breadth of political topics upon which federal employees could comment publicly to include "candidates." *See* 86 Cong.Rec. S2985. Further, the Commission charged with implementing the law believed that it should be narrowly construed so as not to abridge an employee's individual right to participate in the political process. *See, e.g., In re McDuffie*, 1 M.S.P.R. 8 (1979). The Supreme Court's decisions likewise reflect a narrow construction in attempting to strike a careful balance between the "guarantees of freedom" and the "supposed evil of political partisanship." *Mitchell*, 330 U.S. at 96, 67 S.Ct. at 567; *see also Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2890. The Court later noted that though it now recognized public employment was not a privilege, *Connick*, 461 U.S. at 144, 103 S.Ct. at 1688; *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. Congress could still place some limitations on the political activities of federal employees. *See Letter Carriers*, 413 U.S. at 574–75, 93 S.Ct. at 2895.

■ Considering these authorities and the concerns which resulted in the enactment of the Hatch Act, we think a line may be discerned that solves the definitional problem of sorting out what activity is permitted from that which is prohibited. The line becomes visible through the Supreme Court's recognition in both *Letter Carriers* and *Mitchell* that the Hatch Act carefully distinguishes between partisan political activities and mere expressions of views. *See* 413 U.S. at 554–56, 93 S.Ct. at 2885–86; 330 U.S. at 98–99, 67 S.Ct. at 569; *see also* 5 U.S.C. § 7326(1) (partisan activity occurs in an election when a candidate runs as a member of a political party). The very purposes of the Hatch Act and the evils it sought to eliminate demonstrate, in fact, that it is engaging in organized political activity by federal employees that threatens government integrity and effi-

ciency. The dangers of politicized administration of the laws, of "machine politics" in the federal bureaucracy, of coercion of public employees and of reducing public confidence in governmental activities are present especially when employees participate or are directly affiliated with a political party. Put another way, the concern is that federal employees—through coercion or machine politics—will act in concert and produce an inordinate influence on the way government executes the laws and provides services. Thus, finding "partisan activity" implicitly requires a nexus between the government employee and the effort to promote the political party or elect its candidate. It is not enough that the federal employee and the candidate pursue the same political goals independently; the two must work in tandem or be linked together for there to be a violation of the Hatch Act.

■ It is undisputed that neither Biller nor Sombrotto acted in concert with a political party or campaign organization. In fact, neither of the petitioners had any connection with a political party. The Board itself conceded that there was no nexus between petitioners and the Mondale campaign or the Democratic Party. The nexus required to establish their activities as partisan under the Act is therefore lacking. Thus, petitioners' actions were the individual expression of permitted personal opinion on political subjects and candidates. *See Blaylock*, 851 F.2d at 1354; *Wilson v. United States Civil Service Comm'n*, 136 F.Supp. at 106. Their activities do not fall within those activities prohibited under § 7324(a)(2) of the Act or C.F.R. §§ 733.-122(b)(7) or (10). Instead, their acts of writing articles advocating the election of one presidential candidate in preference to another fall squarely within those permissible activities set forth in § 7324(b) of the Act and § 733.111(2) of the Regulations. Consequently, petitioners were erroneously held by the respondent Board to have violated the Act on the first charge.

■ The second charge, that Biller and Sombrotto violated the Hatch Act by urging union members to contribute to the unions' political action funds, presents a closer question. Under 5 C.F.R. § 733.122(3) an employee may not directly or indirectly solicit funds for a partisan political purpose. The instant charges were based on statements in petitioner's articles that exhorted union members to contribute to their respective unions' political action funds. Thus, the question is whether petitioners solicited the funds in concert with a partisan political campaign or organization. As with the first charge, we think the answer in this case is "no".

Although the plain purpose of the challenged writings was to raise funds, it cannot be demonstrated that the funds were solicited for use by a partisan political campaign or organization. To the contrary, as the ALJ found, the funds were "not designated for any political campaign, party, committee or candidate at the time they were made." Finally, there is no proof in the record that suggests either that petitioners were acting in concert with a partisan political campaign or that the funds were actually distributed or spent for that purpose. On that subject, the record is silent.

Moreover, the Board's findings make clear that none of the evils of solicitation sought to be rooted out by the statute or its implementing regulations are present in this case. The Board found that petitioners had no connection with the money the unions' political action funds received—that is, they did not personally collect or administer contributions. Nor did petitioners have any supervisory authority over any union employees from whom contributions were sought—the readers of the magazines. Petitioners' columns obviously did not "strong-arm" employees into contributing. Union members who read the columns were not realistically subjected to the "dread of dismissal." *See Ex Parte Curtis*, 106 U.S. 371, 374, 27 L.Ed. 232 (1882). Again, the Act's concern with the creation of a bureaucratic political machine and with coercion of public employees is not adequately implicated to constitute a violation of the Act. As a result, we conclude that the second charge against petitioners alleg-

ing violations of C.F.R. § 733.122(b)(3) fails for lack of proof.

### III   CONCLUSION

Following *Mitchell* and *Letter Carriers* we have weighed petitioners' First Amendment rights to express publicly their opinions on political subjects and candidates against the government's interest in promoting the efficiency of the public service. Congress' clearly expressed view that when the scales are evenly balanced, the Hatch Act should be construed in favor of the rights of free speech is dispositive. As a consequence, for both charges, we hold that absent a showing of concerted action with a partisan campaign or organization, petitioners' rights of freedom of political expression outweigh the asserted risk of inefficient or corrupt government administration.

For the reasons stated, the order of the Merit System Protection Board finding petitioners Biller and Sombrotto guilty of violating the Hatch Act and its regulations is reversed and vacated. Because we find that the Hatch Act was not violated, we need not reach or decide petitioners' First Amendment arguments.