BERZON, Circuit Judge,
concurring:
Sitting for judicial election while judging cases, Justice Otto Kaus famously quipped, is like “brushing your teeth in the bathroom and trying not to notice the crocodile in the bathtub.” Joseph R. Grodin, In Pursuit of Justice: Reflections of a State Supreme Court Justice 177 (1989) (quoting Kaus). Kaus would know. He sat on the California Supreme Court from 1981 to 1985, Gerald T. McLaughlin, Memorial Dedication to Otto Kaus, 30 Loy. L.A. L.Rev. 923, 923 (1997), having narrowly won a retention election in 1982 and retiring from the court soon before the 1986 vote that would unseat three of his former colleagues, Stephen R. Barnett, Otto and the Court, 30 Loy. L.A. L.Rev. 943, 947 & n.19 (1997).[1]
Kaus’ point about the psychology of judging applies outside the context of judicial elections, for the temptation to engage in overt political behavior affects judges generally. And so I write separately to identify, and hopefully to tame, the “crocodile” stalking today’s majority opinion: the prospect that the principles we apply now will be used in future litigation to challenge the constitutionality of restrictions on the political behavior of sitting judges. The opinion studiously — and designedly— does not address that issue. But it is worth explaining why, in my view, the considerations pertinent to evaluating the complex of constitutional issues raised by *1161 such restrictions are quite different than those the majority opinion applies today.
I.
Today’s opinion addresses the constitutionality of certain provisions of the Arizona Code of Judicial Conduct (“Code”) only as they apply to judicial candidates who, like Wolfson, have not yet ascended to the bench. It does not decide those provisions’ constitutionality as they apply to elected judges who, like Kaus, have already taken their oaths of office. Still less does it decide the constitutionality of restrictions on the political activity of judges who, like us on the federal bench, “hold their Offices during good Behaviour,” U.S. Const, art. Ill, § 1, and never sit for election. In the name of prudence and constitutional avoidance, the majority’s opinion rightly reserves judgment on the constitutionality of restricting the speech of sitting judges, an issue neither properly before us nor necessary to the resolution of this case.
I emphasize the limited scope of today’s decision for fear that future litigants might otherwise seek to obscure it, despite the repeated admonishments in the opinion. Of the five Code provisions we strike today, only one — the solicitation ban- — directly relates to a judicial candidate’s own campaign for office.[2] The remainder prohibit a would-be judge’s efforts to advance the political fortunes of other candidates or causes, through speeches, endorsements, fundraising, financial support, or other campaign assistance.[3] As these proscriptions bear little direct relation to judicial candidates’ personal political fortunes, a casual reader might be forgiven for assuming that they are just as constitutionally offensive as applied outside the election context, to sitting judges, whether or not they reached the bench via election.
In my view, that is not so, for at least two reasons: The analytic framework applicable to political restrictions on sitting judges may well differ from the one we apply today. And the compelling state interest that could well justify such restrictions differs from the one emphasized in the majority opinion. I address each difference in turn.
II.
In applying strict scrutiny to a judicial candidate who is not now a judge, today’s majority opinion rightly rejects the Seventh Circuit’s approach, which applies to political restrictions on elected sitting judges a balancing test derived from the *1162 Supreme Court’s cases on public employee speech. Bauer v. Shepard, 620 F.3d 704 (7th Cir.2010); Siefert v. Alexander, 608 F.3d 974 (7th Cir.2010). Although such a tempered standard has no application to a candidate who has not yet taken his oath of judicial office, whether it would be appropriately applied to political restrictions governing sitting judges is quite a different manner.
The Constitution permits the government to prohibit its employees from speaking about matters of public concern where the government’s interest “in promoting the efficiency of the public services it performs through its employees” outweighs the First Amendment interest in speech. Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Pickering balancing test seeks “both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions.” Garcetti v. Ceballos, 547 U.S. 410, 420, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). And that test recognizes that “there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech.” Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 341, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).
Republican Party of Minnesota v. White, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), did not decide whether the public employee speech cases would justify restrictions on judges’ active support for political causes or the candidacies of others. Justice Kennedy, who was a member of the five justice majority, wrote a separate concurrence, explaining this limitation: “Whether the rationale of Pickering [, 391 U.S. 563, 88 S.Ct. 1731], and Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), could be extended to allow a general speech restriction on sitting judges — regardless of whether they are campaigning — in order to promote the efficient administration of justice, is not an issue raised here.” White, 536 U.S. at 796, 122 S.Ct. 2528 (Kennedy, J., concurring).
In Siefert, 608 F.3d at 985, the Seventh Circuit extended the public employee speech cases to a provision of the Wisconsin Code of Judicial Conduct prohibiting an elected sitting judge from “[p]ublicly endorsing] or speak[ing] on behalf of [a political party’s] candidates or platforms,” id. at 978-79. It reasoned that the government’s authority as an employer, “its duty to promote the efficiency of the public services it performs,” and the imperative that “the work of the judiciary conform[ ] with the due process requirements of the Constitution” justified a less rigorous balancing test for restrictions on elected sitting judges’ participation in the political campaigns or candidacies of others. Id. at 985. In a subsequent decision, the Seventh Circuit extended this balancing test to provisions of the Indiana Code of Judicial Conduct prohibiting elected judges from leading or holding office in political organizations or making speeches on behalf of such organizations. Bauer, 620 F.3d at 710-11.
The core rationale of the public employee speech cases, on which Siefert and Bauer relied, does not apply to the case presently before us. Wolfson has never been an employee of Arizona, let alone a judge. Indeed, he may never become one. While the public employee speech cases do not rest solely on the now-antiquated principle that the government can condition employment on the waiver of First Amendment rights, see Myers, 461 U.S. at 143-44, 103 S.Ct. 1684, the nature of government employment is a necessary *1163 component of their reasoning. Pickering recognized as much, commenting that “it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.” 391 U.S. at 568, 88 S.Ct. 1731. The public employee speech cases thus recognize the “crucial difference, with respect to constitutional analysis, between the government exercising ‘the power to regulate or license, as lawmaker,’ and the government acting ‘as proprietor, to manage [its] internal operation.’ ” Engquist v. Or. Dep’t of Agric., 553 U.S. 591, 598, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (alteration in original) (quoting Cafeteria & Rest. Workers v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Critically, the balancing test the Pickering line of cases articulates does not apply to governmental restrictions on the speech of those, like judicial candidates, not employed by the government. We could not abandon that determinative distinction without dangerously expanding the scope of constitutionally permissible regulation of speech.
But our refusal to apply to a judicial candidate not yet a state employee a balancing test derived from the public employee speech cases says nothing whatever about the applicability of such a test to individuals who have already taken their oaths of judicial office and already receive wages from the state. That question remains unanswered. Resolving the First Amendment challenge of a sitting judge to similar restrictions on his speech will require answering it. And, without prejudging whether we should adopt the Siefert analysis for restrictions on political activity by sitting judges on behalf of political causes or the candidacies of others, I suggest that the analogy to the Pickering line of cases has much to commend it.
III.
Even if we determined that restrictions on the political activity of sitting judges were subject to strict scrutiny, the state interest supporting such a restriction would be' far stronger than the one we hold inadequate to justify the restrictions on judicial candidate Wolfson’s speech today.
The Supreme Court has recognized as a “vital state interest” the interest in maintaining those “safeguard^] against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation’s elected judges.” Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 889, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) (emphasis added) (internal quotation marks and citation omitted). Preserving public confidence includes maintaining the perception of judicial propriety. In other words, “ ‘justice must satisfy the appearance of justice.’ ” In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (quoting Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)). “[T]he appearance of evenhanded justice ... is at the core of due process.” Mayberry v. Pennsylvania, 400 U.S. 455, 469, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (Harlan, J., concurring).
The majority opinion, taking its cue from Supreme Court cases on judicial elections, focuses its strict scrutiny analysis on the interest in preserving the actuality and appearance of judicial impartiality. The case law’s emphasis on impartiality derives from the obligations imposed by the due process clause, particularly “the proposition that an impartial judge is essential to due process.” White, 536 U.S. at 776, 122 S.Ct. 2528. This compelling interest in preserving the appearance of impartiality is both weighty and narrow: weighty, because it rises to the level of a constitutional obligation, requiring a judge to recuse himself from a particular case in the name *1164 of due process, Caperton, 556 U.S. at 886-87, 129 S.Ct. 2252; and narrow, because it refers only to “lack of bias for or against either party to the proceeding,” White, 536 U.S. at 775-76, 122 S.Ct. 2528 (emphasis in original). Given this narrow focus on the parties appearing before a judge in an actual proceeding, the less-restrictive remedy of mandatory recusal is available to a state seeking to protect, as it must, the due process rights of litigants appearing in its courts.
But I would define the state’s interest in preserving public confidence in its judiciary more broadly, as reaching beyond the process due specific litigants in particular cases. Maintaining public trust in the judiciary as an institution driven by legal principles rather than political concerns is a structural imperative. The rule of law depends upon it.
The fundamental importance of this structural imperative has been recognized from the founding of the nation. As Alexander Hamilton emphasized in The Federalist No. 78, the courts possess “neither FORCE nor WILL, but merely judgment. ...” Id. at 433 (Clinton Rossiter ed., 1961). Deprived of those alternative sources of power, the authority of the judiciary instead “lies ... in its legitimacy, a product of substance and perception that shows itself in the people’s acceptance of the Judiciary as fit to determine what the ... law means and to declare what it demands.” Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 865, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); see also White, 536 U.S. at 793, 122 S.Ct. 2528 (Kennedy, J., concurring) (“The power and the prerogative of a court ... rest, in the end, upon the respect accorded to its judgments.”). It is the courts’ perceived legitimacy as institutions grounded in established legal principles, not partisanship, “that leads decisions to be obeyed and averts vigilantism and civil strife.” Bauer, 620 F.3d at 712. Loss of judicial legitimacy thus corrodes the rule of law, “sap[ping] the foundations of public and private confidence, and ... introducing] in its stead universal distrust and distress.” The Federalist No. 78, at 438. In this sense, “[t]he rule of law, which is a foundation of freedom, presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges.” NY State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 212, 128 S.Ct. 791, 169 L.Ed.2d 665 (2008) (Kennedy, J., concurring).
This nation’s political history demonstrates the disastrous effects of the perceived politicization of the courts. Charges that King George “ha[d] obstructed the Administration of Justice” and “ha[d] made judges dependent on his Will alone .... “ were among the founding generation’s justifications for the 1776 revolution. The Declaration of Independence para. 11 (U.S.1776). Similar concerns apply outside the context of a monarchy: Where the judiciary is drawn into the political intrigues of its coordinate branches, the public might well “fear that the pestilential breath of faction may poison the fountains of justice. The habit of being continually marshaled on opposite sides will be too apt to stifle the voice both of law and of equity.” The Federalist No. 81, at 452 (Alexander Hamilton) (Clinton Rossiter ed., 1961).[4] And where the politicization of the judiciary brings it into alliance with the politicians who staff the other two *1165 branches of government, the public may no longer consider “the courts of justice ... as the bulwark of a limited Constitution against legislative encroachments,” The Federalist No. 78, at 437, or executive excesses. In short, when sitting judges support the campaigns of nonjudicial candidates — via endorsements, speeches, money, or other means — the public may begin to see them not as neutral arbiters of a limited system of governance, but as participants in the larger game of politics.[5]
The defendants here express precisely this concern — that if sitting judges may support the campaigns of others, the public will perceive them as masters of the political game, powerbrokers “trading on the prestige of their office to advance other political ends.... ” Siefert, 608 F.3d at 984; see also Model Code of Judicial Conduct R. 4.1, cmt.4 (2011) (justifying prohibitions on endorsements and speeches on behalf of other candidates as “preventing sitting judges] from abusing the prestige of judicial office to advance the interests of others”). The opposite fear is equally justified: Today’s powerbroker is tomorrow’s pawn, as the political winds shift and the next election cycle approaches. The endorsing judge entwines his fate with whomever he endorses and earns the enmity of his favored politician’s opponents. “This kind of personal affiliation between a member of the judiciary and a member of the political branches raises the specter— readily perceived by the general public— that the judge’s future rulings will be influenced by this political dependency.” Wersal v. Sexton, 674 F.3d 1010, 1034 (8th Cir.2012) (Loken, J., concurring in the judgment) (emphasis in original).
In his concurrence in Wersal, Judge Lo-ken concluded that there is a “compelling state interest ... in protecting the political independence of its judiciary.” Id. at 1033. I have no reason at this juncture to come to rest on that question. Instead, I emphasize that, at the very least, there is a powerful state interest in preventing sitting judges from playing the part of political powerbroker and creating the publicly visible interdependence that corrodes confidence in judicial autonomy. Assessing whether that interest qualifies as “compelling,” in the lexicon of First Amendment doctrine, awaits a properly presented case — particularly as the issue will never arise if we first determine that the Pickering balancing test, rather than strict scrutiny, applies to speech restrictions on sitting judges.
Almost certainly, a state does not forfeit this powerful interest in judicial autonomy by selecting its judges via popular election. It was in the context of a state prohibition against judicial candidates expressing their personal views on disputed legal and political issues during their own campaigns that the Supreme Court has explained that “ ‘the greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process ... the First Amendment rights that attach to their roles.’ ” White, 536 U.S. at 788, 122 S.Ct. 2528 (alteration in original) (quoting Renne v. Geary, 501 U.S. 312, 349, 111 S.Ct. 2331, 115 L.Ed.2d *1166 288 (1991) (Marshall, J., dissenting)). But that observation does not seem to extend to prohibitions on campaigning on behalf of issue elections or for nonjudicial candidates. The Supreme Court’s case law on the political behavior of government employees has “carefully distinguished] between [proscribable] partisan political activities and mere expressions of views,” which are constitutionally protected. Biller v. U.S. Merit Sys. Prot. Bd., 863 F.2d 1079, 1089 (2d Cir.1988) (citing U.S. Civil Serv. Comm’n v. Nat’l Ass’n of Letter Carriers, AFL-CIO, 413 U.S. 548, 554-56, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 98-99, 67 S.Ct. 556, 91 L.Ed. 754 (1947)); Siefert, 608 F.3d at 984; see also Citizens United, 558 U.S. at 341, 130 S.Ct. 876 (citing Letter Carriers in support of the proposition that the Supreme Court has often “upheld a narrow class of speech restrictions that operate to the disadvantage of certain persons, ... based on an interest in allowing governmental entities to perform their functions”).[6] Indeed, prohibitions on supporting the campaigns of others complement, rather than contradict, the decision to select judges via popular election: By adopting such restrictions alongside judicial elections, states harness the “legitimizing power of the democratic process” while avoiding worrisome interdependence between judges and politicians from the remaining two branches.
Nor should we forget that our own federal scheme supplements its structural protections for judicial autonomy with direct prohibitions on politicking. Structurally, our Constitution endows judges with life tenure and prohibits the diminution of their salaries. U.S. Const, art. Ill, § 1. Such protections seek to encourage “that independent spirit in the judges which must be essential to the faithful performance of so arduous a duty,” The Federalist No. 78, at 437, and help “preserve[] the independence of the Federal Judiciary,” White, 536 U.S. at 795, 122 S.Ct. 2528 (Kennedy, J., concurring). In addition to those structural safeguards the federal judiciary has adopted a code of ethics that regulates directly the behavior of federal judges, including restrictions on supporting the political causes and candidacies of others.[7] Our ethical code is independent of the structural safeguards that insulate us from the political branches, and it performs a slightly different function. I see no reason why a state cannot adopt the one without the other, except with regard to a judicial candidate’s personal campaign *1167 for judicial office in states where judicial elections are held.
Critically, the state interest in preserving an autonomous judiciary is powerful only insofar as it applies to sitting judges; it has no application to judicial candidates who, like Wolfson, have not yet reached the bench. The spectacle of sitting judges aiding partisan allies in their political struggles corrodes the public repute of the judiciary in a way that the participation of a mere candidate never can. Indeed, the interest in an independent judiciary does not come into existence until a judge assumes office; the politicking of lay people cannot damage the reputation of a body whose ranks they have not yet joined. Individuals who run for judicial office may themselves be officers of political parties or holders of nonjudicial political office when they decide to run for a judgeship. That politicians can become judges is no secret. But that is different from allowing judges to remain or become politicians while still on the bench. Moreover, as the majority opinion explains, a layman who has not yet assumed office has no prestige derived from the office he has not yet attained to lend his political brethren. Essentially, ascending to the bench is like taking the veil, and that veil does not descend until the oath of office is «sworn.
Meanwhile, to the extent White sought to preserve voters’ access to “relevant information” and to prevent “state-imposed voter ignorance” about the candidates sitting for election, 536 U.S. at 782, 788, 122 S.Ct. 2528 (internal quotation marks omitted), such concerns are weaker for already seated judges. Such judges already possess a record of decisions that interested voters can analyze to inform themselves about the desirability of competing judicial candidates; under White, they are free to campaign for their own reelection by drawing attention to their records on the bench. By contrast, lay people, like Wolfson, who have not yet sat on the bench lack any such judicial record, making their campaign speech — including endorsements— relatively more valuable for what it reveals about how they might perform in office.
In sum, the principles applicable to the constitutionality of political restrictions on sitting judges diverge dramatically from those we apply to today’s challenge to restrictions on a judicial candidate not now a judge. The standard of review may well differ. And the powerful interests supporting such restrictions differ, too. I need not address, as the issue is not before us, whether the particular restrictions we review today would be constitutional as applied to sitting judges. But I am quite sure that the analysis required to resolve that question will receive scant support from our decision in this case.

. Justices of the California Supreme Court and Judges of the California Court of Appeal are nominated by the Governor, confirmed by the Commission on Judicial Appointments, and then subject to voter approval in a retention election at the time of the next gubernatorial election and, thereafter, at the end of each 12-year term. See Cal. Const, art. 6, § 16(d); Cal. Elec.Code § 9083. Judges of the California Superior Court usually sit for general election every six years, Cal. Const, art. 6, § 16(b), unless an incumbent is not unopposed, Cal. Elec.Code § 8203, or a county adopts by majority popular vote the retention-election system applicable to appellate judges, Cal. Elec.Code § 8220.

. The full text of the provision is as follows:
(A) A judge or judicial candidate shall not....
(6) personally solicit or accept campaign contributions other than through a campaign committee authorized by Rule 4.4....
Ariz.Rev.Stat. Ann. § 17A, Sup.Ct. Rules, Rule 81, Code of Jud. Conduct (2009), Rule 4.1(A)(6).

. The full text of the provision is as follows:
(A) A judge or judicial candidate shall not do any of the following:
(2)make speeches on behalf of a political organization or another candidate for public office;
(3) publicly endorse or oppose another candidate for any public office;
(4) solicit funds for or pay an assessment to a political organization or candidate, make contributions to any candidate or political organization in excess of the amounts permitted by law, or make total contributions in excess of fifty percent of the cumulative total permitted by law....
(5) actively take part in any political campaign other than his or her own campaign for election, reelection or retention in office ____
Ariz.Rev.Stat. Ann. § 17A, Sup.Ct. Rules, Rule 81, Code of Jud. Conduct (2009), Rule 4.1(A)(2)-(5).

. This quotation appears in an explanation of why the Supreme Court is "composed of a distinct body of magistrates, instead of being one of the branches of the legislature, as in the government of Great Britain....” Id. at 451. But the dangers of perceived partisanship apply at least as much to judges independently chosen but participating publicly in the selection of legislative or executive policies and decisionmakers.

. I leave aside whether sitting judges may endorse or support other candidates for judicial office. Such support does not implicate the powerful state interest in the appearance of judicial independence from the political branches I discuss in the text. Moreover, a sitting judge’s endorsement of a judicial candidate is a singularly effective mode of voter education. New observers are as qualified as sitting judges to evaluate the competencies of those who would join their ranks. The concerns and analyses in this concurring opinion are therefore limited to judicial participation in issue, legislative, and executive elections.

. It is true that an elected judge's support of another candidate or cause signals something about his views, which might be marginally useful to voters assessing their options at the polls. See Siefert, 608 F.3d at 994-95 (Rovner, J., dissenting) ("We are, after all, often judged by the company we keep.”). But so long as an elected judge may articulate his personal views of legal and political issues in support of his own campaign, attentive voters have a far more direct means with which to form an opinion about competing judicial candidates.

. The full text of the relevant canon provides:
(A)A judge should not:
(1)act as a leader or hold any office in a political organization;
(2) make speeches for a political organization or candidate, or publicly endorse a candidate for public office; or
(3) solicit funds for, pay an assessment to, or make a contribution to a political organization or candidate, or attend or purchase a ticket for a dinner or other event sponsored by a political organization or candidate.
(B) A judge should resign the judicial office if a judge becomes a candidate in a primary or general election for any office.
(C) A judge should not engage in any other political activity. This provision does not prevent a judge from engaging in activities described in Canon 4.
Administrative Office of U.S. Courts, Code of Judicial Conduct for United States Judges, Canon 5 (2011).