## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 09-1713

THE HONORABLE JOHN SIEFERT,

*Plaintiff-Appellee,*

*v.*

JAMES C. ALEXANDER, et al., in their
official capacity as members of the
Wisconsin Judicial Commission,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-cv-126-bbc—**Barbara B. Crabb**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED JUNE 14, 2010

Before FLAUM, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* The plaintiff, John Siefert, is
an elected Wisconsin circuit court judge in Milwaukee
County. He would like to state his affiliation with
the Democratic Party, endorse partisan candidates for
office, and personally solicit contributions for his next
election campaign, but is concerned because these

activities are prohibited by the Wisconsin Code of Judicial Conduct. Rather than violate the code and face discipline, Siefert filed suit under 42 U.S.C. § 1983 for declaratory and injunctive relief against the members of the Wisconsin Judicial Commission, the body that enforces the Code of Judicial Conduct. After considering the parties' cross-motions for summary judgment, the district court granted Siefert's motion, declared the rules prohibiting a judge or judicial candidate from announcing a partisan affiliation, endorsing partisan candidates, and personally soliciting contributions unconstitutional, and enjoined the defendants from enforcing these rules against Siefert. The Commission appeals. We affirm the district court's holding on the partisan affiliation ban but reverse the district court's ruling that the bans on endorsing partisan candidates and personally soliciting contributions are unconstitutional.

## I. Background

Plaintiff John Siefert was first elected to the circuit court for Milwaukee County in 1999 and has served as a judge since. Prior to being elected a circuit court judge, he was a member of the Democratic Party and participated in a number of partisan activities. He served as a delegate to the Democratic National Convention, twice ran as a Democrat for the state legislature, twice ran as a Democrat for county treasurer (holding that office from 1990 to 1993), and served as an alternate elector for President Bill Clinton in 1992. He would like to

once again join the Democratic Party and list his party membership in response to candidate questionnaires. He believes membership in the Democratic Party would communicate his desire for social justice and peace, but does not wish to appeal to partisanship as a candidate or as a judge. Siefert would also like to endorse partisan candidates for office. At the time he initiated this suit, he sought to endorse now-President Barack Obama; he expressed a desire to endorse Jim Doyle for governor of Wisconsin in 2010[1] and President Obama if he decides to run for reelection in 2012. Finally, Siefert would like to solicit contributions for his upcoming 2011 campaign by making phone calls to potential contributors, signing his name to fundraising letters, and by personally inviting potential donors to fundraising events. He would continue to use a campaign committee to handle the ministerial tasks of fundraising and to collect and report donations.

The defendants are the executive director and members of the Wisconsin Judicial Commission (the "Commission"). The Commission investigates and prosecutes potential violations of the Wisconsin Code of Judicial Conduct. The Commission also issues, from time to time, advisory opinions on the interpretation of the Code of Judicial Conduct.

---

[1] Jim Doyle has since announced that he will not run for another term as governor. *See* Lee Bergquist, Stacy Forster & Patrick Marley, *Doyle Won't Seek Reelection in 2010*, Milwaukee Journal Sentinel, Aug. 15, 2009, *available at* http://www.jsonline.com/news/statepolitics/53302852.html.

Wisconsin conducts two sets of elections; one set (i.e., a primary and then general election) is held in the spring for positions filled through nonpartisan elections and the other is held in the fall for the partisan elected positions. Nonpartisan officeholders include judges of the circuit courts, court of appeals, and supreme court, as well as the state superintendent of public instruction, county board members, county executives, and municipal and school district officers. The election for these positions is nonpartisan in the sense that all candidates (who meet the eligibility requirements) appear on the ballot without party identification. Similarly, political parties have no power to slate candidates in the nonpartisan election. Wis. Const. art. VII, § 9; Wis. Stat. §§ 5.58, 5.60. A spring primary is necessary if more than two candidates meet the nomination requirements for a nonpartisan position. The top two vote-getters in the primary proceed to the nonpartisan April election, which is, in essence, a runoff. Wis. Stat. § 8.11; Wis. Blue Book 884 (2009-10). If only one or two candidates meet the nomination requirements, no primary is necessary. (Practically, it appears that incumbent judges, at least recently, are rarely challenged, and if so, are challenged by one opponent only and thus subject to only one election in April. *See* Laurel Walker, *Judicial Selections Not Quite Non-Partisan*, Milwaukee Journal Sentinel, Dec. 25, 2009, *available at* http://www.jsonline.com/news/statepolitics/80121422. html). Voting for offices filled through partisan elections, including sheriff and district attorney, takes place in the fall with a primary election to choose a single

candidate for each of the two major parties, followed shortly thereafter by a head-to-head partisan general election. Wis. Blue Book 884; *see* Wis. Stat. §§ 5.64, 8.16.

Party affiliation has been absent from the ballot in Wisconsin's judicial elections since 1913, and the district court found, based on the work of a historian employed by the Commission, that a tradition of nonpartisanship had taken hold among judicial candidates even earlier. However, Wisconsin did not expressly prohibit judges from joining a political party until 1968, when it adopted a comprehensive code of judicial conduct. *See* Charles D. Clausen, *The Long and Winding Road: Political and Campaign Ethics Rules for Wisconsin Judges*, 83 Marq. L. Rev. 1, 2-3 (1999). In October 2004, the supreme court amended the code to extend a number of rules to cover judicial candidates in addition to sitting judges, including the prohibitions on party membership, partisan endorsements, and personal solicitation of campaign contributions. *See Wisconsin Supreme Court Order 00-07,* 2004 WI 134 (Oct. 29, 2004).

The plaintiff challenges three distinct provisions of the rules adopted in 2004. The challenged provisions are all contained in Wisconsin Supreme Court Rule 60.06:

> **SCR 60.06 A judge or judicial candidate shall refrain from inappropriate political activity.**
>
> . . .
>
> (2) Party membership and activities.
>
> (a) Individuals who seek election or appointment to the judiciary may have aligned themselves

with a particular political party and may have engaged in partisan political activities. Wisconsin adheres to the concept of a nonpartisan judiciary. A candidate for judicial office shall not appeal to partisanship and shall avoid partisan activity in the spirit of a nonpartisan judiciary.

(b) No judge or candidate for judicial office or judge-elect may do any of the following:

    1.  Be a member of any political party.

    2.  Participate in the affairs, caucuses, promotions, platforms, endorsements, conventions, or activities of a political party or of a candidate for partisan office.

    3.  Make or solicit financial or other contributions in support of a political party's causes or candidates.

    4.  Publicly endorse or speak on behalf of its candidates or platforms.

(c) A partisan political office holder who is seeking election or appointment to judicial office or who is a judge-elect may continue to engage in partisan political activities required by his or her present position.

. . .

(4) Solicitation and Acceptance of Campaign Contributions. A judge, candidate for judicial office, or judge-elect shall not personally solicit or accept campaign contributions. A candidate

may, however, establish a committee to solicit and accept lawful campaign contributions. The committee is not prohibited from soliciting and accepting lawful campaign contributions from lawyers. A judge or candidate for judicial office or judge-elect may serve on the committee but should avoid direct involvement with the committee's fundraising efforts. A judge or candidate for judicial office or judge-elect may appear at his or her own fundraising events. When the committee solicits or accepts a contribution, a judge or candidate for judicial office should also be mindful of the requirements of SCR 60.03 and 60.04(4).

Siefert challenges the ban on party membership in SCR 60.06(2)(b)1, the ban on partisan endorsements in SCR 60.06(2)(b)4, and the ban on personal solicitation of campaign contributions in SCR 60.06(4). He does not challenge the ban on "appeal[s] to partisanship and . . . partisan activity" in SCR 60.06(2)(a) or the balance of SCR 60.06(2)(b). Nor does he challenge SCR 60.05, which directs judges to conduct their extra-judicial activities in a manner that does not cast doubt on the judge's capacity to act impartially, demean the judicial office, or interfere with the proper performance of judicial duties.

## II. Discussion

A little background on the law surrounding the First Amendment rights of elected judges and judicial candidates is helpful to understanding what follows. In 2002,

the Supreme Court decided *Republican Party of Minn. v. White* (*White I*), 536 U.S. 765 (2002). *White I* struck down a Minnesota canon of judicial conduct that prohibited judges and judicial candidates from announcing their views on disputed legal and political issues. *Id.* at 788. The Court, applying a strict scrutiny approach, recognized a compelling state interest in preventing bias for or against particular litigants, but held that the state did not have a compelling interest in preventing a judge from having a preconception for or against particular views. *Id.* at 776-77.

At the same time, *White I* left open some of the questions we deal with today. Justice Kennedy, a member of the five-vote majority and author of a separate concurrence, noted specifically that states are obligated to regulate the behavior of their judges to protect the integrity of their courts. "To strive for judicial integrity is the work of a lifetime. That should not dissuade the profession. The difficulty of the undertaking does not mean we should refrain from the attempt." *Id.* at 794 (Kennedy, J., concurring). Justice Kennedy noted that elected judges "have discovered in the law the enlightenment, instruction, and inspiration that make them independent-minded and faithful jurists of real integrity." *Id*. at 796. We think it beyond doubt that states have a compelling interest in developing, and indeed are required by the Fourteenth Amendment to develop, these independent-minded and faithful jurists. *See Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252, 2259 (2009); *In re Murchison*, 349 U.S. 133, 136 (1955). State rules are the means of their development. *White I*, 536 U.S. at 794 (Kennedy, J., concurring).

But *White I* makes clear that there are boundaries to the state's regulation of judicial elections. On remand, the Eighth Circuit, adopting the Supreme Court's strict scrutiny approach from *White I,* invalidated Minnesota's ban on partisan activities by judges and the portion of Minnesota's ban on direct solicitation of contributions that prohibited judges from signing fundraising letters or speaking to large groups of potential donors at fundraisers. *Republican Party of Minnesota v. White* (*White II*), 416 F.3d 738, 754, 765-66 (8th Cir. 2005) (en banc). Siefert relies heavily on these cases to challenge Wisconsin's code of judicial conduct, which contains provisions that are similar but not identical to those at issue in *White II*.

The Commission relies on two government employment cases, *U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers,* 413 U.S. 548 (1973) and *Garcetti v. Ceballos*, 547 U.S. 410 (2006), to argue that a less stringent standard applies. *Letter Carriers* upheld the constitutionality of Section 9(a) of the Hatch Act, which prohibited federal employees from taking "an active part in political management or in political campaigns." *Garcetti* dismissed a § 1983 claim brought by a deputy district attorney who claimed that his employer, a county, took adverse employment action against him after he wrote a memorandum in which he recommended dismissal of a criminal case based on government misconduct, and that this action amounted to retaliation for exercising his First Amendment right to free speech. Both of these cases in turn relied on the deferential standard of review articulated in *Pickering v. Bd. of Ed. of Twp. High*

*Sch. Dist. 205, Will County*, *Ill.*, 391 U.S. 563 (1968), which balances the public employee's right to speak out on matters of public concern against the government's interest in "promoting the efficiency of the public services it performs through its employees." *Id.* at 568. In *White I*, the Supreme Court reserved the question of whether this line of cases could justify restrictions on the speech "of judges because they are judges." 536 U.S. at 796 (Kennedy, J., concurring) ("Whether the rationale of *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, and *Connick v. Myers* could be extended to allow a general speech restriction on sitting judges—regardless of whether they are campaigning—in order to promote the efficient administration of justice, is not an issue raised here." (internal citations omitted)).

The Commission is correct that, ordinarily, governmental entities have some leeway to proscribe certain categories of speech among citizens to promote the efficient performance of governmental functions. *See Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 899 (2010) (collecting cases). "[T]here are certain governmental functions that cannot operate without some restrictions on particular kinds of speech." *Id.* The First Amendment allows, for instance, certain prohibitions on students' use of vulgar terms at school, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683 (1986), state employees' speech about working conditions, *Connick v. Myers*, 461 U.S. 138, 146 (1983), prisoners' union-organizing activity, *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 131-32 (1977), military members' dissent, *Parker v. Levy*, 417 U.S. 733, 758 (1974), federal employees' political

activity, *Letter Carriers*, 413 U.S. at 564, state employees' political activity, *Broadrick v. Oklahoma*, 413 U.S. 601, 616 (1973), and public school teachers' speech, *Pickering*, 391 U.S. at 568. But *White I* is clear that in the context of elections, judges are free to communicate their ideas to voters. Much of our discussion involves our attempt to harmonize these two strains of First Amendment law.

### A. SCR 60.06(2)(b)1: Party Membership

SCR 60.06(2)(b)1 states that "No judge or candidate for judicial office or judge-elect may . . . [b]e a member of any political party." We think this rule falls squarely within the ambit of the Supreme Court's analysis in *White I*. Just as in *White I*, the party affiliation ban forbids "speech on the basis of its content and burdens a category of speech that is 'at the core of our First Amendment freedoms'—speech about the qualifications of candidates for public office." *White I*, 536 U.S. at 774. We agree with Judge Siefert that the partisan affiliation ban acts to prohibit his speech on both his political views and his qualifications for office. Therefore, the clause is a content-based restriction on speech subject to strict scrutiny. *Id.*; *United States. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000).

To survive strict scrutiny, SCR 60.06(2)(b)1 must be narrowly tailored to serve a compelling state interest. *White I*, 536 U.S. at 774-75. To show that a restriction on speech is narrowly tailored, the state must show that it "does not 'unnecessarily circumscrib[e] protected ex-

pression.'" *Id.* at 775 (citing *Brown v. Hartledge*, 456 U.S. 45, 54 (1982)).

The Commission argues that the ban is necessary to preserve both "impartiality," defined as the "absence of bias or prejudice in favor of, or against, particular parties, or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge," SCR 60.01(7m), and the appearance of impartiality.[2]

In *White I*, the Supreme Court cautioned against vague invocations of "impartiality." 536 U.S. at 775. Insofar as impartiality refers to "the lack of bias for or against either *party* to the proceeding," it is a compelling state interest. *Id.* (emphasis in original). This is consistent with the constitutional guarantee of due process, which requires recusal in cases where there is a strong probability of "actual bias." *See, e.g.*, *Caperton*, 129 S. Ct. at 2265 (holding that due process required a justice of the West Virginia Supreme Court of Appeals to recuse himself from a case involving a company whose president spent approximately $3 million to elect the justice while the company's appeal was pending). On the other hand, the *White I* Court squarely rejected

---

[2] The Commission also argues that "nothing in the Constitution requires Wisconsin to establish a partisan judiciary." However, this is not a case about whether partisan affiliation will appear on the ballot, whether parties will play a formal role in nominating judicial candidates for the general election, or any of the other mechanics of the electoral process.

the argument that a state has a compelling interest in guaranteeing that judges do not have a "preconception in favor of or against a particular *legal view*." 536 U.S. at 777 (emphasis in original). We not only allow, but expect, judges to have preconceived views on legal issues. *See Laird v. Tatum*, 409 U.S. 824, 835 (1972) (mem. of Rehnquist, J.) ("Proof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias."). Finally, the *White I* Court left open the possibility that "open-mindedness"—the willingness to consider opposing views and remain open to persuasion—is a compelling state interest. 536 U.S. at 778. Because the Court found that the canon at issue did not serve the interest of open-mindedness, it did not decide whether such an interest was in fact compelling. *Id.*

The crux of the state's concern here seems to be that a judge who publicly affiliates with a political party has indicated that he is more inclined toward that party's stance on the variety of legal issues on which that party has a position. But that is the purported compelling state interest that *White I* squarely rejected. 536 U.S. at 777-78. The state does not have a compelling interest in preventing candidates from announcing their views on legal or political issues, let alone prohibiting them from announcing those views by proxy.[3] Nor can casting

---

[3] Wisconsin's politics, like our nation's, are dominated by two large parties which are by no means ideologically homogenous.

(continued…)

the argument in terms of the "appearance of bias" save it—because "avoiding judicial preconceptions on legal issues is neither possible nor desirable, pretending otherwise by attempting to preserve the 'appearance' of that type of impartiality can hardly be a compelling state interest either." *Id.* at 778.

The Commission also argues that the ban on party affiliation is designed to prevent bias for or against parties to a particular case, or the appearance of that bias. While this interest was certainly recognized in *White I*, this rule is not tailored to it.[4] Arguably, party membership is an association that could call into

---

[3] (...continued)

Even on the most polarizing issues, party membership is a significantly less accurate proxy for a candidate's views on contested issues than membership in special interest or advocacy groups, which the Wisconsin Code of Judicial Conduct does not expressly prohibit. Relying on an advisory opinion issued by the Commission, the defendants argue that the Code prohibits judges and judicial candidates from taking a leadership role in groups such as the Sierra Club or Mothers Against Drunk Driving, which advocate "social goals through litigation and legislative action." Regardless of whether Wisconsin courts eventually adopt the Commission's interpretation of the Code, the flat ban in SCR 60.06(2)(b)1 treats party membership more harshly than any other affiliation.

[4] The Commission does not articulate an argument that SCR 60.06(2)(b)1 furthers impartiality in the sense of open-mindedness, so we need not decide to what extent, if any, this interest is compelling.

question the impartiality of a judge when sitting on a case involving that party, or perhaps that party's main rival. *But see White II*, 416 F.3d at 755 ("[T]he fact that the matter comes before a judge who is associated with the Republican or Democratic Party would not implicate concerns of bias for or against that party unless the judge were in some way involved in the case beyond simply having an 'R' or 'D' . . . after his or her name.") However, nothing in the record suggests that political parties themselves are such frequent litigants that it would be unworkable for a judge who chooses to affiliate with a political party to recuse himself when necessary.

The Commission attacks the practicality of recusal by arguing that a judge who declared a partisan affiliation would have to recuse himself in every case where a party member was a litigant, or where the political party was supporting a particular outcome, making recusal impractical. But this significantly overstates the likelihood of bias toward particular litigants. Membership in a political party is not the same as membership in a smaller, more cohesive organization. Furthermore, mere membership does not connote the type of intricate relationship with party politics that would create the appearance of bias. Without some specific, individualized relationship, the affiliation between a judge who is a member of a political party and other members of that political party is simply too diffuse to make it reasonable to assume that the judge will exhibit bias in favor of his fellow party members. Indeed, twelve states employ partisan elections with respect to at least some judge-ships. *See* American Judicature Society, *Methods of Judicial*

*Selection*, http://www.judicialselection.us/judicialselection/ methods/selection_of_judges.cfm?state= (last visited June 9, 2010) (identifying Alabama, Illinois, Indiana, Kansas, Louisiana, New Mexico, New York, Ohio, Pennsylvania, Tennessee, Texas and West Virginia as states that employ partisan judicial elections). There is no evidence to suggest that these states have faced an unworkable number of recusals as a result of their partisan judicial elections, nor that their partisan system of elections works a denial of due process. *Cf. White I*, 536 U.S. at 776 (noting that due process requires an "impartial" judge in the sense of a judge lacking a bias for or against either party to a proceeding). In short, defendants have failed to show why recusal, which does not restrict speech, is an unworkable alternative to Wisconsin's ban on judges and judicial candidates announcing a party affiliation.

## B.  SCR 60.06(2)(b)4: Endorsement of Partisan Candidates

SCR 60.06(2)(b)4 prohibits judges and judicial candidates from "[p]ublicly endors[ing] or speak[ing] on behalf" of any partisan candidate or platform. Judge Siefert argues that, like the choice to identify as a member of the Democratic Party, the choice to endorse another candidate is simply a means of expressing his political views. We disagree. An endorsement is a different form of speech that serves a purpose distinct from the speech at issue in *White I* and in the party identification rule discussed above. Accordingly, we believe that it should be subject to a distinct analysis. In keeping with a long line of Supreme

Court precedent determining the rights of government employees going back to at least *Ex Parte Curtis*, 106 U.S. 371 (1882), a balancing approach, not strict scrutiny, is the appropriate method of evaluating the endorsement rule.

While the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office," *Citizens United*, 130 S. Ct. at 898 (citing *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (internal quotation omitted)); *see also White I*, 536 U.S. at 774 (noting that "speech about the qualifications of candidates for public office" is "at the core of our First Amendment freedoms"), a public endorsement does not fit neatly in that category. Endorsements are not simply a mode of announcing a judge's views on an issue, or a shorthand for that view. In fact, the American Bar Association model code from which the rule is derived justifies the restriction on endorsement based on the danger of "abusing the prestige of judicial office to advance the interests of others." Model Code of Judicial Conduct R. 4.1 cmt. [4] (2007). The Commission identifies its interest in the rule as an attempt to preserve the appearance of impartiality in the judiciary. Appellant's Br. at 36.

While an interest in the impartiality and perceived impartiality of the judiciary does not justify forbidding judges from identifying as members of political parties, a public endorsement is not the same type of campaign speech targeted by the impermissible rule against party affiliation in this case or the impermissible rule against

talking about legal issues the Supreme Court struck down in *White I*. As Judge Siefert notes, "[e]ndorsements primarily benefit the endorsee, not the endorser" and endorsements may be exchanged between political actors on a quid pro quo basis. Appellee's Br. at 37 & n.11. This amounts to a concession that offering an endorsement is less a judge's communication about his qualifications and beliefs than an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker.

This distance between an endorsement and speech about a judge's own campaign justifies a more deferential approach to government prohibition of these endorsements. *See Letter Carriers*, 413 U.S. at 556; *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 99 (1947); *see also Biller v. U.S. Merit Sys. Prot. Bd.*, 863 F.2d 1079, 1089 (2d Cir. 1988) (noting that the Supreme Court has drawn a careful line between "partisan political activities" and "mere expressions of views"). When judges are speaking as judges, and trading on the prestige of their office to advance other political ends, a state has an obligation to regulate their behavior. We thus see a dividing line between the party affiliation rule, which impermissibly bars protected speech about the judge's own campaign, and the public endorsement rule, which addresses a judge's entry into the political arena on behalf of his partisan comrades. *See Citizens United*, 130 S. Ct. at 899 (noting that while political speech restrictions are subject to strict scrutiny, "a narrow class of speech restrictions" are constitutionally permissible if "based on an interest in allowing governmental entities to perform

their functons."). We note that *Citizens United*, even as it broadly prohibited restrictions on "political speech," reconfirmed the validity of the *Letter Carriers* line of cases, which specifically targeted political activity by government employees. *Id.* And we reiterate that the Supreme Court's holding in *White I* does not necessarily forbid any regulation of a judge's speech. In fact, Justice Kennedy's concurrence indicates just the opposite. Furthermore, unlike restrictions designed, for example, to regulate federal employees' political activity, restrictions on judicial speech may, in some circumstances, be required by the Due Process Clause. This provides a state with a sufficient basis for restricting certain suspect categories of judicial speech, even political speech. The only question is whether a ban on public endorsements serves this state interest.

Judge Siefert argues that judges are different from "employees" because they are more akin to legislative actors who are "ultimately accountable to the voters." *See Jenevien v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007). However, this conception of a judge's role is improperly limited. The Hatch Act, as considered in *Letter Carriers*, was not confined to low-level bureaucrats, but covered the entire executive branch of the federal government, with specific exemptions for the President, Vice President, and "specified officials in policy-making positions." *Letter Carriers*, 413 U.S. at 561. While Wisconsin judges receive job evaluations from the voting public, they are employed in the essential day-to-day task of operating a judicial system that must not only be fair and impartial, but must also appear to the public to be fair and impar-

tial. To the extent that Wisconsin chooses to restrict those employed to perform important judicial functions from being in the business of trading political endorsements, important due process interests are served.

Furthermore, while *Garcetti, Connick, Letter Carriers,* and *Pickering* all concern public employees, the ability of the government to regulate the speech of the employees in those cases is not solely dependent on its authority as an employer. *See Connick*, 461 U.S. at 143-44 (tracing the development of the law in this area). Instead, by the time it decided *Pickering*, the Supreme Court had recognized that the doctrine that the government was allowed to subject its employees "to any conditions, regardless of how unreasonable" had been "uniformly rejected." *Pickering*, 391 U.S. at 568 (citation omitted). "At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.; see also Mitchell*, 330 U.S. at 96 ("Again this Court must balance the extent of the guarantees of freedom against a congressional enactment to protect a democratic society against the supposed evil of political partisanship by classified employees of the government."). The rationale behind government restriction identified in *Pickering*, therefore, is related both to

the government's power as an employer and its duty to promote the efficiency of the public services it performs. Here, we emphasize again, we are not concerned merely with the efficiency of those services, but that the work of the judiciary conforms with the due process requirements of the Constitution; this tips the balance even more firmly in favor of the government regulation.

The observation that elected judges are "ultimately accountable to the voters" seems irrelevant to the due process issue. A judge must also be accountable to her responsibilities under the Fourteenth Amendment. It is small comfort for a litigant who takes her case to state court to know that while her trial was unfair, the judge would eventually lose an election, especially if that litigant were unable to muster the resources to combat a well-financed, corrupt judge around election time. As Justice Kennedy pointed out in his concurrence in *White I*, state rules fill the gap between elections in order to develop the fair jurists to whom each litigant is entitled. *White I*, 536 U.S. at 794 (Kennedy, J., concurring).

So, as in *Pickering*, we have to find the balance between the state's interest and the judge's. Under the *Pickering* approach, narrow tailoring is not the requirement; the fit between state interest and regulation need not be so exact. Instead, the state's interest must be weighed against the employee's interest in speaking. *Pickering*, 391 U.S. at 568; *Bridges v. Gilbert*, 557 F.3d 541, 549 (7th Cir. 2009). And the state's interest in the endorsement regulation is a weighty one. Due process requires both

fairness and the appearance of fairness in the tribunal. "[T]o perform its high function in the best way, 'justice must satisfy the appearance of justice.' " *Murchison,* 349 U.S. at 136 (citing *Offutt v. United States*, 348 U.S. 11, 14 (1954)). The Commission's concern is that judges who "publicly endorse or speak on behalf of [a party's] candidates or platforms" undermine this appearance of impartiality.

At the same time, the constitutional protection in a political endorsement is tempered by the limited communicative value of such an endorsement. Judge Siefert concedes that endorsements may be less about communicating one's qualifications for office than bolstering another politician's chances for office. Appellee's Br. at 37 & n.11. While *White I* teaches us that a judge who takes no side on legal issues is not desirable, a judge who takes no part in political machinations is.

The Conference of Chief Justices, as amicus, points to the same quid pro quo concerns conceded by Judge Siefert to justify the endorsement ban. "Without this rule, judicial candidates and judges-elect could elicit promises from elected officials, including local prosecutors and attorneys general, in exchange for their endorsement." Br. of Conf. of Chief Justices, amicus, at 23. The Commission justifies its interest in the ban based on the danger that parties whom the judge has endorsed may appear in the judge's court, and argues that the risk of bias is not mitigated by the remedy of recusal, due to both the volume of litigation involving the government in Wisconsin and the number of small circuit courts in

Wisconsin, where recusal would be impracticable. Both the Commission's and the Chief Justices' concerns are valid. Any suggestion that the rule should only forbid Judge Siefert from making endorsements while identifying himself as "Judge" is dubious (he would be prohibited from using his title anyway by SCR 60.03(2)); the Commission is entitled to believe that simply removing the honorific "judge" will not conceal Siefert's true identity from the public.

Judge Siefert, arguing for a strict scrutiny standard, suggests that the availability of recusal, a less restrictive alternative to the ban on endorsements, dooms the prohibition. The example Judge Siefert uses to dispute the Commission's argument that recusal is too onerous for some of its courts—his endorsement of President Obama—is a particularly good example of why strict scrutiny is the inappropriate inquiry. The value of that endorsement to the President would be directly congruent to Judge Siefert's status in the community, the publicity his endorsement would engender, and the narrowness of the margin in public support for the President. While all of these factors enhance the value of the endorsement, they similarly enhance its problematic nature. A local judge who tips the outcome of a close election in a politician's favor would necessarily be a powerful political actor, and thus call into question the impartiality of the court. Conversely, if Judge Siefert's public endorsement carried no weight, why preserve his right to make this public endorsement by jeopardizing the efficiency of Wisconsin's courts? *See Broadrick*, 413 U.S. at 613 ("Application of the overbreadth

doctrine in this manner is, manifestly, strong medicine. It has been employed by the Court sparingly and only as a last resort."). Once we accept that public endorsements are not the type of speech contemplated in *White I,* our task is to balance the value of the rule against the value of the communication. The concerns the Commission and its amici articulated also speak to a broader concern that freely traded public endorsements have the potential to put judges at the fulcrum of local party politics, blessing and disposing of candidates' political futures. Given that Wisconsin's interest in preventing its judges' participation in politics unrelated to their campaigns is justified based on its obligations under the Due Process Clause, as well on its obligation to prevent the appearance of bias from creeping into its judiciary, and that the endorsement restriction does not infringe on a judge's ability to inform the electorate of his qualifications and beliefs, the regulation is permissible.

We note that the rule only bans endorsements in partisan elections. Wisconsin also holds nonpartisan elections for judges, as well as the state superintendent of public education, county board members, county executives, and municipal and school district officers. Wis. Blue Book 884; *see* Wis. Stat. §§ 5.58, 5.60. According to the text of the rule ("No judge or candidate for judicial office . . . may publicly endorse or speak on behalf of [a political party's] candidates or platforms"), endorsements in these nonpartisan elections may be freely given. Were we to consider this provision under strict scrutiny, this underinclusiveness could be fatal to the rule's constitutionality.

But, because we are applying a balancing test, the question we ask is whether the exception for nonpartisan elections so weakens the ban (and therefore the state's asserted interest in enforcing it) that the scales tip in favor of the plaintiff's right to speak. *See SEIU, Local 3 v. Municipality of Mt. Lebanon*, 446 F.3d 419, 425 (3d Cir. 2006) ("[T]o the extent that the [regulation] is not tailored to the [state's] stated interest, there is a commensurate reduction in the [state's] interest in its enforcement." (quotation omitted)). We think it does not for two reasons.

First, the Commission justifies the ban based on the onerous nature of recusal in the case where a judge endorses a prosecutor or sheriff who frequently appears in front of the court. None of the nonpartisan officials appear as frequently before the court as law enforcement officials. Of these nonpartisan officials, only judges are necessarily lawyers, and the frequency with which a private practitioner appears before a court pales in comparison with prosecutors and sheriffs who are involved in litigation nearly every day. Even nonpartisan candidates that may come before the court as part of a suit against their institution (for instance, school board members) will not appear as frequently before the court as the partisan law enforcement officials that the ban reaches.

Second, the difficulty of recusal is but one factor in favor of the ban; the other is Wisconsin's interest in preventing judges from becoming party bosses or power-brokers. Wisconsin has a justified interest in having its

judges act and appear judicial rather than as political authorities. This interest is directly implicated by endorsements in partisan elections and much less so, if at all, in nonpartisan elections. In a nonpartisan election, an endorsement connotes the quality of one candidate among several. In a partisan election, an endorsement can still mean an assessment of the quality of the endorsed candidate, but it also carries implications that the endorsement is given because of party affiliation; in other words, it suggests that the political party of the endorsing judge is behind the candidate. In that sense, the judge becomes a spokesperson for the party. The state's interest in preventing partisan endorsements, then, is appropriately given more weight than nonpartisan endorsements.

Our treatment of the endorsement prohibition is based on the claims that Judge Siefert, an incumbent, brings. This is not the appropriate case to address the issue of regulations for judicial candidates who are not judges. Their potential role on a court or the impact that such endorsements could have on a judicial election as a whole may justify the type of regulation we have here, but that is for another day. *United States v. Wurzbach*, 280 U.S. 396, 399 (1930) ("[I]f there is any difficulty, which we are far from intimating, it will be time enough to consider it when raised by some one whom it concerns."). Wisconsin has an interest in regulating the non-campaign political activities of its judges, and prohibiting public endorsements serves this interest.

### C.  SCR 60.06(4): Personal Solicitation

The final portion of the Wisconsin Judicial Code of Conduct at issue here is the ban on the personal solicitation of contributions by judges or judicial candidates. SCR 60.06(4) allows a judge to set up a finance committee to raise campaign contributions, serve on that committee, and appear at fundraising events. The canon prohibits judges from directly soliciting or accepting contributions. Finally, judges are admonished to avoid "direct involvement" in their campaign's fundraising efforts, although no particular level of involvement is expressly forbidden.

At heart, the solicitation ban is a campaign finance regulation. As such, it is reviewed under the framework set forth in *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam). *See also Stretton v. Disciplinary Bd. of Supreme Ct. of Penn.*, 944 F.2d 137, 145-46 (3d Cir. 1991) (a pre-*White I* case upholding Pennsylvania's personal solicitation ban under a deferential standard). In *Buckley*, the Supreme Court recognized a compelling state interest in preventing corruption or the appearance of corruption in elections through some campaign finance regulation. *Id.* at 26-27; *see also Citizens United*, 130 S. Ct. at 908. The Court reasoned that restrictions on raising funds were typically less burdensome to speech than restrictions on spending funds, and thus created a two-tiered scheme of review for campaign finance regulation. *Buckley*, 424 U.S. at 20-21. Under *Buckley*, restrictions on spending by candidates and parties is reviewed with strict scrutiny, while restrictions on contributions are reviewed under

less rigorous "closely drawn" scrutiny. *Id.* at 25. We note that *Citizens United*, rather than overruling *Buckley*, noted and reinforced the distinction between independent expenditures on behalf of candidates and direct contributions to candidates. *Citizens United*, 130 S. Ct. at 909-11; *see also* Richard M. Esenberg, *The Lonely Death of Public Campaign Financing*, 33 Harv. J.L. & Pub. Pol'y 283, 290-92 (2010). Since we are dealing with regulation of campaign contributions, we therefore proceed with the analysis under *Buckley*.

Because the direct solicitation ban does not restrict the amount or manner in which a judicial candidate can spend money on his or her campaign, we apply closely drawn scrutiny. This is consistent with the approach the Supreme Court took in analyzing the various solicitation bans in the Bipartisan Campaign Finance Reform Act. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 136-38 & n.40 (2003), *overruled in part on other grounds by Citizens United*, 130 S. Ct. at 913; *see also id.* at 177, 181-82. *But see id.* at 314 (Kennedy, J., concurring in part in the judgment and dissenting in part) (applying strict scrutiny to solicitation ban); *White II*, 416 F.3d at 765-66 (applying strict scrutiny to solicitation ban without discussion of *McConnell*). We note, however, that even if strict scrutiny applied, a solicitation ban may still survive if it is narrowly tailored to prevent corruption or the appearance of corruption. *See McConnell*, 540 U.S. at 314 (Kennedy, J., concurring in part in the judgment and dissenting in part) (concluding that the Federal Election Campaign Act § 323(e), which prohibits federal candidates from soliciting soft-money contributions,

survives strict scrutiny); *White II*, 416 F.3d at 765-66 (suggesting that portion of Minnesota's solicitation ban that prohibits judges from knowing the identity of contributors or non-contributors would survive strict scrutiny). We believe it survives under either standard. *But see Weaver v. Bonner*, 309 F.3d 1312, 1322-23 (11th Cir. 2002) (striking down personal solicitation ban after applying strict scrutiny).

The Commission suggests that this ban ensures that "no person feel directly or indirectly coerced by the presence of judges to contribute funds to judicial campaigns," Order No. 00-07 at 11 (Abrahamson, C.J., concurring), and eliminates the potential bias or appearance of bias that would accompany lawyers who frequently appear before a judge being personally solicited for campaign contributions. Siefert argues that the solicitation ban does not serve the impartiality interest as defined in *White I* and that the interest advanced by the state in protecting potential donors from coercion is not one that we should recognize as compelling.

Wisconsin's personal solicitation ban serves the anti-corruption rationale articulated in *Buckley* and acts to preserve judicial impartiality.[5] A contribution given

---

[5] These two interests are closely linked and may be best understood as different ways of stating the same concern. *Cf. White II*, 416 F.3d at 769 (Gibson, J., dissenting) ("'Open-mindedness,' in Justice Scalia's terminology, is in reality simply a facet of the anti-corruption interest that was recognized

(continued...)

directly to a judge, in response to a judge's personal solicitation of that contribution, carries with it both a greater potential for a quid pro quo and a greater appearance of a quid pro quo than a contribution given to the judge's campaign committee at the request of someone other than the judge, or in response to a mass mailing sent above the judge's signature. In *White II*, for example, the Eighth Circuit recognized that a ban prohibiting "candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case," 416 F.3d at 765, but concluded that prohibiting a candidate from personally signing a solicitation letter or making a blanket address to a large group does not advance that interest, *id.* at 765-66. Similarly, while we decline to recognize here a compelling state interest in protecting potential contributors from feeling "coerced," we note that the perceived coerciveness of direct solicitations is closely related to their potential impact on impartiality.[6] A direct solicitation closely links the

---

[5] (...continued)

in *Buckley v. Valeo* and subsequent campaign finance cases."(citations omitted)).

[6] Because we do not adopt the "coercion" rationale to support SCR 60.06(4), we need not reach Siefert's argument that the direct solicitation ban is significantly underinclusive because it does not apply to candidates for legislative office. In any event, this argument misapprehends the respective

(continued...)

quid—avoiding the judge's future disfavor—to the quo—the contribution. We do not mean to suggest that judges who directly solicit contributions are necessarily behaving inappropriately, but the appearance of and potential for impropriety is significantly greater when judges directly solicit contributions than when they raise money by other means.

The question remains whether the solicitation ban hews closely enough to the anti-corruption rationale that purportedly justifies it. Wisconsin allows judges to serve on their own finance committees, and while it directs them to avoid involvement with the committee's fundraising efforts, it does not specifically prohibit them from reviewing lists of contributors. *Cf. White II*, 416 F.3d at 766 (concluding that where judicial canon prohibited judges from knowing the identities of contributors and non-contributors, additional restrictions on blanket solicitations to large groups were unconstitutional). Wisconsin also allows judges to appear at their own fundraising events, where they will come into

---

[6] (...continued)
roles of legislators and judges. Legislators are not expected to be impartial; indeed, they are elected to advance the policies advocated by particular political parties, interest groups, or individuals. Judges, on the other hand, must be impartial toward the parties and lawyers who appear before them. In addition, legislators can only act with the support of their colleagues. Judges—particularly trial court judges—exercise wide and largely unreviewable discretion over discrete cases involving specific parties and lawyers.

contact with people who they will likely presume are contributors. Finally, the ban reaches solicitations that do not implicate the risk of a quid pro quo, such as solicitations directed at family members.

We conclude that the solicitation ban is drawn closely enough to the state's interest in preserving impartiality and preventing corruption to be constitutional. The fact that a judge might become aware of who has or has not contributed to his campaign does not fatally undercut the state's interest in the ban. As discussed earlier, the personal solicitation itself presents the greatest danger to impartiality and its appearance. Like SCR 60.06(4), the solicitation ban at issue in *McConnell* did not prohibit officeholders from becoming aware of soft-money contributions and contained an exception for fundraising events. *See* 2 U.S.C. § 441i(e) (codifying FECA § 323(e)). Finally, to the extent that the ban affects, at the margins, some solicitations that do not pose a risk to impartiality, that impact is not fatal to the ban. Just as the state may enact a contribution limit, rather than ask of each individual contribution whether it poses the risk of corruption, the state may enact a ban on direct solicitations, a ban tailored to the specific behavior that poses the greatest risk. *Cf. Buckley*, 424 U.S. at 26-28. Moreover, the ban's effect on innocuous contributions is small because the judge's campaign committee remains free to solicit those individuals. And unlike the partisan affiliation and endorsement bans, there is no reasonable, less restrictive means available here. It is an unfortunate reality of judicial elections that judicial campaigns are often largely funded by lawyers, many of whom

will appear before the candidate who wins. It would be unworkable for judges to recuse themselves in every case that involved a lawyer whom they had previously solicited for a contribution. Because the ban on direct solicitation of contributions by judicial candidates prevents corruption and preserves impartiality without impairing more speech than is necessary, we reverse the district court's decision on SCR 60.06(4).

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment in favor of Siefert with respect to the party affiliation ban, SCR 60.06(2)(b)1, but REVERSE the district court's judgment with respect to the public endorsement and personal solicitation bans, SCR 60.06(2)(b)4 and SCR 60.06(4).

ROVNER, *Circuit Judge*, dissenting in part. Protecting judicial integrity is a government interest of highest magnitude, as is protecting the rights guaranteed by the First Amendment. Reconciling these two competing interests is no small feat, and when evaluating the party membership restrictions in Section II.A and the personal solicitation restriction in Section II.C, I believe

the majority successfully navigates the competing con-
cerns. As for the ban on endorsements of partisan candi-
dates, the majority and I begin at the same starting
point—with the notion that endorsements of candidates
in political elections are troubling and have the potential
to compromise judicial impartiality. I part ways with the
majority, however, where it applies the balancing test
from *Pickering* and *Connick* to the endorsement ban.
*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will
County, Ill.*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461
U.S. 138, 142 (1983). Because I believe this is the wrong test
to apply, I respectfully dissent.

Laws and regulations that restrict speech on the basis
of content are subject to the high hurdle of the strict
scrutiny test. *United States v. Playboy Entm't Group, Inc.*,
529 U.S. 803, 813 (2000). Such laws are "presumptively
invalid, and the Government bears the burden to rebut
that presumption." *United States v. Stevens*, 130 S. Ct.
1577, 1584 (2010) (internal citations omitted); *Playboy
Entm't Group*, 529 U.S. at 813, 817. In addition, speech about
the qualifications of candidates for public office is at the
core of First Amendment freedoms and is thus also strictly
scrutinized. *Republican Party of Minn. v. White*, 536 U.S.
765, 774, 781 (2002); *Eu v. San Francisco County Demo-
cratic Cent. Comm.*, 489 U.S. 214, 222-23 (1989). The law
presumes that these intrusions on First Amendment rights
are invalid and shifts the burden of proof to the govern-
ment to demonstrate that these regulations are narrowly
tailored to serve a compelling government interest.
*Stevens*, 130 S. Ct. at 1584; *Eu*, 489 U.S. at 222. There
could be no clearer example of a restriction that is

both content-based and that burdens speech regarding qualifications for office than the one at issue here: Wisconsin Supreme Court Rule 60.06(2)(b)4 states that no judge or candidate for judicial office may "[p]ublicly endorse or speak on behalf of [a party's] candidates or platforms." SCR 60.06(2)(b)4. The majority concedes that under a strict scrutiny analysis, the regulation at issue here would fail. *Supra* at 24. Rather than reach that unpalatable result, however, it has manufactured a new balancing test not heretofore applied to the First Amendment rights of elected judges.

It is true, of course, that some forms of speech fall outside the protections of the First Amendment, including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *See Stevens*, 130 S. Ct. at 1584. And in the case of public employees, the Supreme Court has relaxed the scrutiny it applies to regulation of government employee speech, holding that a public employee's right to speak on matters of public concern must be balanced against the government's need for efficient operation of government functions. *Garcetti v. Ceballos*, 547 U.S. 410, 418-19 (2006); *Connick*, 461 U.S. at 142; *Pickering*, 391 U.S. at 568. Neither this court nor the Supreme Court, however, has ever held that these decisions limiting the speech of public employees can be applied to elected officials' speech, including the speech of elected judges.

In the seminal case on free speech and judicial codes of conduct, the Supreme Court applied strict scrutiny in evaluating the challenged provisions of Minnesota's

Code of Judicial Conduct. *White*, 536 U.S. at 774. Although the *White* decision considered the rights of candidates seeking judicial office as opposed to those already holding office, the language of the decision reflects two important principles that apply to the case before us today—the Court's recognition that political speech is highly protected and that content-based restrictions must be viewed most skeptically. *Id.* The court in *White* stated,

> the notion that the special context of electioneering justifies an *abridgement* of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.

*Id.* at 781 (internal citations omitted) (emphasis in original).

In *White*, it was undisputed and uncontroversial that the court should apply strict scrutiny in evaluating the content-based restrictions of the canons of judicial conduct. *Id.* at 774. Even the two dissenting opinions, which vigorously defended the particular speech restrictions on judges, did so while applying strict scrutiny. *See White*, 536 U.S. at 800 (Stevens, J., dissenting) ("Minnesota has a compelling interest in sanctioning such statements."); *Id.* at 817 (Ginsburg, J., dissenting) ("In addition to protecting litigants' due process rights, the parties in this

case further agree, the pledges or promises clause advances another compelling state interest: preserving the public's confidence in the integrity and impartiality of its judiciary."). In short, both the majority and dissent in *White* applied strict scrutiny to a content-based speech prohibition for judicial candidates.[1]

Nevertheless, as Justice Kennedy noted in his concurrence, the *White* decision left open the question as to whether "the rationale of *Pickering* and *Connick* could be extended to allow a general speech restriction on sitting judges—regardless of whether they are campaigning—in order to promote the efficient administration of justice. . . ." *White*, 536 U.S. at 796 (internal citations omitted).

---

[1] In his concurrence, Justice Kennedy noted that he would go further and hold that "content-based speech restrictions that do not fall within any traditional exception should be invalidated without inquiry into narrow tailoring or compelling government interests. The speech at issue here does not come within any of the exceptions to the First Amendment recognized by the Court. Here, a law is directed to speech alone where the speech in question is not obscene, not defamatory, not words tantamount to an act otherwise criminal, not an impairment of some other constitutional right, not an incitement to lawless action, and not calculated or likely to bring about imminent harm the State has the substantive power to prevent. No further inquiry is necessary to reject the State's argument that the statute should be upheld." *White,* 536 U.S. at 792-93 (Kennedy, J., concurring).

Although the *White* court left the question unanswered, that opinion and others provide compelling support for the proposition that strict scrutiny is the proper test for evaluating restraints on an elected judge's speech. The Supreme Court has long found the speech of elected officials to be as protected as that of ordinary citizens. In *Bond*, the Supreme Court held that the State of Georgia could not exclude a state representative from membership in the legislature based on his criticism of the Vietnam War. *Bond v. Floyd*, 385 U.S. 116, 133 (1966). The Court specifically noted that the interest of the public in hearing all sides of a public issue is advanced by extending the same First Amendment protections to legislators as to ordinary citizens. *Id.* at 136. The Court later held the same for a sheriff who questioned the motivations of a judge's charge to a grand jury. The Court reasoned that "the role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Wood v. Georgia*, 370 U.S. 375, 395 (1962). Forty years later, a majority of the Supreme Court repeated this same statement in evaluating the restrictions imposed by a canon of judicial conduct. *White*, 536 U.S. at 781-82. After reviewing *White*, and its analyses of these earlier cases, the Fifth Circuit concluded that strict scrutiny was the appropriate test for evaluating a state's interest in suppressing a sitting judge's speech. *Jenevein v. Willing*, 493 F.3d 551, 557-58 (5th Cir. 2007).

In contrast, non-elected employees, like those covered by the Hatch Act, are subject to a test which balances the interests of the employee as a citizen, in commenting

upon matters of public concern, against the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. *See U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers*, 413 U.S. 548, 561 (1973). The Hatch Act restricts the speech of government employees by prohibiting them from taking an active part in political management or political campaigns, but notably exempts the two elected executive branch employees, the president and vice president, from coverage. 5 U.S.C. § 7322(1); *See also Letter Carriers*, 413 U.S. at 561. In sum, no Supreme Court decision or Seventh Circuit case has applied a balancing test to the speech of elected officials.

It would be folly, of course, to ignore the reality that elected judges are different from elected legislators and executives. "Legislative and executive officials act on behalf of the voters who placed them in office; judges represent the Law." *White*, 536 U.S. at 803 (Ginsburg, J., dissenting) (internal citations omitted). *See also Buckley v. Ill. Judicial Inquiry Bd.*, 997 F.2d 224, 228 (7th Cir. 1993) ("Judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength of the state's interest in restricting their freedom of speech.").

This distinction, however, does not warrant abandoning a strict scrutiny analysis of content-based regulations of speech about the political qualifications of candidates for elected office. Content-based regulations are, after all, some of the most reviled by the First Amendment and election speech among the most protected.

There is no doubt that the due process rights guaranteed by the Fourteenth Amendment are equally compelling, but we need not abandon well-settled First Amendment jurisprudence and set aside strict scrutiny to protect due process, as the majority claims. Rather, the solution is to apply strict scrutiny but give proper weight to the exceedingly compelling interest the state has in ensuring an impartial and fair judiciary. *See id.* at 228 (noting that the fact that elected judges are different from elected legislators and executive officials bears on the strength of the state's interest in restricting their freedom.). *See also White*, 536 U.S. at 783 ("we neither assert nor imply that the First Amendment requires campaigns for judicial office to sound the same as those for legislative office."). In evaluating a restraint on judge's speech under a strict scrutiny analysis, a court must consider its hefty obligation to provide litigants with a fair adjudicative proceeding by an impartial and disinterested tribunal—a right guaranteed by the Due Process Clause of the Fourteenth Amendment, as well as its obligation to preserve public confidence in the integrity and impartiality of the judiciary. *See White*, 536 U.S. at 813, 817 (Ginsburg, J., dissenting).

Furthermore, although elected judges are not the same as elected legislators and executives, they are also not entirely like judges appointed for life or for fixed terms—immune from the influence of popular opinion. As Justice Scalia pointed out in *White*, a judge contemplating releasing a notorious terrorist is well aware that she faces the pressure of being voted out of office come

the next election cycle. *Id.* at 782. Thus, in some limited sense, elected judges, for better or for worse, know that they serve at the pleasure of the public. And although a state is free to establish any constitutional system it wishes to populate its benches, states that choose to elect judges have made a particular decision about the role of the public in the selection of judges.

Our federal Constitution, of course, provides for appointment of judges for life. As Justice O'Connor recounted in *White*, the first twenty-nine states did not use elections for selecting judges. *White*, 536 U.S. at 791 (O'Connor, J., concurring). In the 1830's and 1850's as part of the Jacksonian movement toward greater popular control of public office, many states turned from appointing judges to popular elections. *Id.* Thirty-one states have turned from non-electoral systems to popular elections. *Id.* at 792. There may be many reasons why a state opts to elect judges, but such a decision reflects, at least in part, a policy decision that to the extent that judges have any discretion to mold the law—and of course they do—the people should be able to have some say in how that discretion will be used. For example, in the area of sentencing where discretion can be large, the public may choose to elect candidates who are "tough on crime" or who "judge with compassion." The choice to elect judges may also represent an attempt to allow the people to choose among the populace the person they see as most fit to judge, but embedded in this choice is most certainly some consideration about how that candidate understands and would apply

the law. The decision to hold judicial elections, therefore, may negatively impact the integrity of the judiciary in ways that are unavoidable, *see White*, 536 U.S. at 782; *see also id*. at 789 (O'Connor, J., concurring) (explaining why the very practice of electing judges undermines the interest in an impartial judiciary), but it is, nevertheless, a legitimate choice by a state.

Having made a policy decision allowing the public to shape the bench, a state must allow judges greater leeway to communicate their opinions. Thus, although elected judges are not like other elected officials, they are also not like public employees subject to *Pickering*—that is, employees who answer only to the government as employer and not to the public at large. As the majority in *White* pointed out, "if the State chooses to tap the energy and the legitimizing power of the democratic process [in the election of judges], it must accord the participants in that process the First Amendment rights that attach to their roles." *White*, 536 U.S. at 788. "Opposition [to electing judges] may be well taken (it certainly had the support of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about." *Id*. at 787-88. Endorsements are part of that discussion in much the same way that announcing one's views on the legal issues of the day are—the issue before the court in *White*. We are, after all, often judged by the company we keep. There is much to say about the utility and harm of endorsements, but because my disagreement with the majority is over the level of scrutiny

to be applied to the regulation, I need not spill ink evaluating the benefits and harms of endorsements. Most importantly, it is important to note that applying strict scrutiny will not mean that the speech of sitting judges cannot be regulated more restrictively than the speech of other elected officials; it most certainly can. The state, after all, has an exceptionally compelling interest in protecting the integrity of the judiciary and the due process rights of litigants.

In short, I would apply a strict scrutiny test to the announce clause at issue in this case. Whatever the result may be in an ordinary case where a state passes a blanket prohibition on endorsements by sitting judges, the result here is made simple by the fact that Wisconsin allows endorsements for non-partisan but not partisan elections. As even the majority concedes, the under-inclusiveness of the provision is fatal to the rule's constitutionality when applying strict scrutiny. *See White*, 536 U.S. at 780.

Wisconsin has opted to allow judges to endorse candidates in non-partisan elections. Such endorsements threaten judicial fairness and the appearance of fairness no less than endorsements in partisan elections. Lawyers and judges who lose non-partisan judicial elections, for example, go right back to practicing (and perhaps appearing as litigants) in the same small circuits in Wisconsin in which they ran and were endorsed by sitting judges. A criminal defendant prosecuted by such an endorsed attorney will not question the fairness of his trial any less because the prosecuting attorney ran in

a non-partisan rather than a partisan election. And a judge who makes or breaks a non-partisan candidate's career is no less of a power broker than one who endorses a partisan candidate. It may be true that party-affiliated sheriffs and prosecutors appear frequently in courtrooms, but it is also true that frequent litigators, who are the very same lawyers who are most qualified and most likely to run for judge, should they lose, will go right back to litigating before those same judges who endorsed them.

By allowing endorsements in non-partisan elections, Wisconsin has largely eviscerated the force of any asserted concern. A regulation that is so under-inclusive diminishes the credibility of the government's rationale for restricting speech. *White*, 536 U.S. at 780.

It may be that the endorsement provision causes us such unease because we expect a judge not to use her office for personal gain—either her own or others'. In fact, Wisconsin Supreme Court Rule 60.03(2) prohibits improper use of the visibility and prestige of the judicial office. Endorsements arguably use the visibility and prestige of the judicial office in an improper manner. Wisconsin, however, has not articulated this as its interest and indeed cannot, as it allows endorsements in non-partisan races.

Although I disagree with the majority about the proper test to apply, it is likely that under different cir-cumstances our outcome would nevertheless be the same and I would find myself concurring in the result. My dissent stems entirely from the unique situation

presented here. Wisconsin has opted to elect judges in popular elections and has further mired those judges in that political process by allowing them to make non-partisan endorsements. Endorsements undermine the integrity of the judiciary regardless of whether they focus on partisan or non-partisan races. Once Wisconsin greased the slope for non-partisan endorsements, it should not have been surprised that partisan endorsements could come sliding after. Wisconsin has failed to demonstrate that its endorsement ban is narrowly tailored to prevent the harm it asserts.