Sanders County Republican Central Committee v. Bullock, 12-35543

SCHROEDER, Circuit Judge, dissenting:

This decision is a big step backwards for the state of Montana, which we all agree has a compelling interest in maintaining an independent and impartial judiciary.  The majority ignores the practical effects of its decision on that interest when it takes a formulaic approach to First Amendment doctrine.  This is the first opinion to hold that even though a state has chosen a non-partisan judicial selection process, political parties have a right to endorse candidates.  This means parties can work to secure judges' commitments to the parties' agendas in contravention of the non-partisan goal the state has chosen for its selection process.

The Supreme Court in *Republican Party of Minn. v. White* (*White I*), 536 U.S. 765 (2010) recognized that judges have a life beyond the bench and make statements throughout their legal careers on political and legal issues.  "[J]udges often state their views on disputed legal issues outside the context of adjudication—in classes that they conduct, and in books and speeches."  *Id.* at 778.  Such activity differs from partisan endorsements.  Judges' public discussion of their legal and political values therefore poses less of a threat to judicial open-mindedness than do endorsements by political parties.

Partisan endorsements do not protect the candidate's right to speak that was at the core of *White I*.  Nor is endorsement necessary to protect the rights of the

members and leaders of political parties to express judicial candidate preferences since they can lawfully endorse in their individual capacities.

This is thus an unwarranted extension of *White I*. This and other such extensions of *White I* lead to disruptions and distortions in the non-partisan processes states have developed in order to prevent judicial elections from turning on promises to decide cases in ways that will get votes. Thirty-nine states have judicial elections, and nearly all have enacted laws to treat judicial elections differently from political elections. American Judicature Society, Judicial Campaigns and Elections: Campaign Conduct, *available at* http://www.judicialselection.us/judicial_selection/campaigns_and_elections/campaign_conduct.cfm?state=. The Conference of Chief Justices has decried the trend toward eliminating these distinctions. Conference of Chief Justices, Declaration: Judicial Elections are Different than Other Elections (2007), *available at* http://ccj.ncsc.dni.us/JudicialSelectionResolutions/DeclarationJudicialElections.html. The Conference's Declaration, quoting Chief Justice Roberts in his confirmation hearing, states, "[j]udges are not politicians. They cannot promise to do certain things in exchange for votes."

The Supreme Court in *White I* held only that the state violated the First Amendment when it prohibited "candidates for judicial election from announcing

their views on disputed legal and political issues." 536 U.S. at 788. Today's decision extends this protection to political parties' endorsements in previously non-partisan elections. The result is to encourage a judiciary dependent upon political alliances. Political endorsements place judges in a position of indebtedness to "powerful and wide-reaching political organizations that can make or break them in each election cycle." *Republican Party of Minn. v. White* (*White II*), 416 F.3d 738, 768 (8th Cir. 2005) (Gibson, J., dissenting). Partisan politics are particularly pernicious because parties serve as "natural bundling agents that coordinate sprawling political coalitions across all types of policy domains and venues." *See* Michael S. Kang & Joanna M. Sheperd, *The Partisan Price of Justice: An Empirical Analysis of Campaign Contributions and Judicial Decisionmaking,* 86 N.Y.U. L. Rev. 69, 107 (2011). Failing to recognize this, the majority and the Eighth Circuit in *White II* err in concluding that political parties are just another interest group. *See* 416 F.3d at 755.

Political endorsements, much more than judges' discussion of issues, lead to political indebtedness, which in turn has a corrosive impact on the public's perception of the judicial system. *See Wolfson v. Brammer*, 822 F. Supp. 2d 925, 931 (D. Ariz. 2011) ("Public confidence in the independence and impartiality of the judiciary is eroded if judges or candidates are perceived to be subject to

3

political influence."); *Siefert v. Alexander,* 608 F.3d 974, 985–86 (7th Cir. 2010) ("Due process requires both fairness and the appearance of fairness in the tribunal."); *see also Cox v. Louisiana,* 379 U.S. 559, 565 (1965) (upholding state statute prohibiting picketing outside a courthouse because of the state's interest in protecting "against the possibility of a conclusion by the public under these circumstances that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process"); *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 565 (1973) (upholding the Hatch Act's ban on partisan activity by federal civil servants because "it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it . . . ."). Recognizing this, the Seventh Circuit has held that a ban on judges' endorsements of political candidates is not subject to strict scrutiny and is constitutional. *Siefert*, 608 F.3d at 986 ("While *White I* teaches us that a judge who takes no side on legal issues is not desirable, a judge who takes no part in political machinations is.").

The detrimental effects of the parties' ability to endorse in judicial elections is multiplied by their ability to engage in expenditures on behalf of or in opposition to judicial candidates. *See Citizens United v. Fed. Elec. Comm'n.,* 130 S. Ct. 876

4

(2010). The fact that political parties can back up their endorsements with significant sums of money threatens to further erode state judges' ability to act independently and impartially. *See* Brennan Center for Justice, The New Politics of Judicial Elections 2009–10 (2011), *available at* http://newpoliticsreport.org/site/wp-content/uploads/2011/10/JAS-NewPolitics2010-Online-Imaged.pdf.

In holding that Montana has a less restrictive means of structuring its judicial selection process, the majority fails to comprehend that this would take more than a simple tweak of the system. The majority presents judicial appointment as a less restrictive means of achieving the state's admittedly compelling interest in an impartial judiciary and one that does not implicate the First Amendment. *See White I,* 536 U.S. at 788–92 (O'Connor, J., concurring). This alternative, however, is more theoretical than realistic. Despite dramatic changes in judicial election processes, states have been reluctant to shift to judicial appointments. *See* Roy A. Schotland, *New Challenges to States' Judicial Selection*, 95 Geo. L. J. 1077, 1081–82 (2007). As the American Judicature Society has noted, no state in the past decade, since the Court's decision in *White I*, has used its democratic process to shift away from judicial elections. *See* American Judicature Society, Chronology of Successful and Unsuccessful Merit

Selection Ballot Measures, *available at*

http://judicialselection.us/uploads/documents/Merit_selection_chronology_1C233

B5DD2692.pdf. "[A] generation of experience . . . makes it clear that elections

will stay in many and perhaps all of the states that have that system." Conference

of Chief Justices, *supra*. In sum, a shift away from judicial elections is not a

realistic alternative in states that have chosen judicial elections.

Today's decision is another step in the unfortunate slide toward erasing the

fundamental distinctions that states have created between their selection processes

for judicial offices and political offices. These distinctions are foundational to

states' abilities to maintain separation of powers between the branches of

government. *White I,* 536 U.S. at 803–04 (Ginsburg, J., dissenting) ("Whether

state or federal, elected or appointed, judges perform a function fundamentally

different from that of the people's elected representatives. . . . The ability of the

judiciary to discharge its unique role rests to a large degree on the manner in which

judges are selected."). The Supreme Court's decision in *White I* was not intended

to collapse these differences. The Court said, "[w]e neither assert nor imply that

the First Amendment requires campaigns for judicial office to sound the same as

those for legislative office." *Id.* at 783.

The inevitable impact of increasing partisanship, coupled with the potential

for increasing volumes of monetary contributions, serves only to erode the perceived and actual fairness of litigation in the state courts. These are the unfortunate and unforeseen consequences of the majority's unwarranted extension of *White I*, especially when viewed in the light of *Citizens United*.

In my view, the Republican Central Committee should not succeed on the merits of its argument that the ban on political parties' endorsements is unconstitutional. I therefore respectfully dissent and would affirm the denial of a preliminary injunction.